# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CSH THEATRES, L.L.C., | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. 9380-VCMR |
| | ) |
| NEDERLANDER OF SAN FRANCISCO ASSOCIATES, | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |
| | ) |
| NEDERLANDER OF SAN FRANCISCO ASSOCIATES, | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CSH CURRAN, LLC, CAROLE SHORENSTEIN HAYS AND JEFF HAYS, | ) |
| | ) |
| Third-Party Defendants | ) |
| | ) |
| and | ) |
| | ) |
| SHORENSTEIN HAYS-NEDERLANDER THEATRES LLC | ) |
| | ) |
| Nominal Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: July 19, 2018
Date Decided: July 31, 2018

Raymond J. DiCamillo, Susan M. Hannigan, and Sarah A. Galetta, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David B. Tulchin, Brian T. Frawley, Andrew J. Finn, and Yavar Bathaee, SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Plaintiff and Counterclaim Defendant/Third Party Defendants*.

Tammy L. Mercer and Daniel M. Kirshenbaum, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Matthew L. Larrabee, Michael S. Doluisio, and Benjamin M. Rose, DECHERT LLP, New York, New York; *Attorneys for Defendant and Counterclaim/Third Party Plaintiff*.

Elizabeth Wilburn Joyce and Joanne P. Pinckney, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; *Attorneys for Nominal Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor**

In the 1970s, a real estate tycoon and a magnate of the theater world formed a partnership to present Broadway-style theater in San Francisco. For almost fifty years, the families of those two founders continued to operate the company by presenting Broadway shows in the three theaters they controlled in San Francisco. One of those theaters was the historic Curran Theatre, which the company leased. In 2010, the owners of the Curran Theatre decided to sell, and the company considered buying the Curran. Ultimately, the representatives of the two families could not come to an agreement about whether to buy the Curran, so one of the families bought it instead. After the purchase of the Curran, relationships between the two families became increasingly strained. The owners of the Curran eventually cut ties with the company and began operating the Curran themselves.

This lawsuit arises from that series of events, and the parties ask the Court to determine whether a promise to continue renting the Curran to the company was broken and whether the purchasers of the Curran have breached their fiduciary duties to the company. After a five-day trial and based on the findings of fact and legal analysis below, the Court finds there was no enforceable promise to lease the Curran to the company, but the owners of the Curran breached certain fiduciary and contractual duties to the company.

1

## I. BACKGROUND

The facts in this opinion are my findings based on the parties' stipulations, over 500 trial exhibits, and the testimony of eleven live witnesses presented at a five-day trial in October and November 2017. I grant the evidence the weight and credibility that I find it deserves.[1]

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker. After being identified initially, individuals are referenced herein by their first names because many of the individuals share last names. No disrespect or familiarity is intended. Joint trial exhibits are cited as "JX #," and the Pretrial Stipulation and Order is cited as "PTO #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs. For the sake of efficiency, I refer to the counterclaim plaintiff and third-party plaintiff as "Counterclaim Plaintiff" and the counterclaim defendant and third-party defendants collectively as "Counterclaim Defendants."

There are nine objected-to joint exhibits relied on in this memorandum opinion: JX 202, JX 222, JX 238, JX 242, JX 243, JX 253, JX 263, JX 291, and JX 382. Counterclaim Defendants made all the objections. JX 222, JX 238, JX 242, JX 243, JX 253, JX 263, and JX 291 are all emails sent from Carole Shorenstein Hays. Counterclaim Defendants object to them on the grounds that they are irrelevant, relevant but prejudicial, confusing, misleading, or needlessly cumulative, or hearsay. I find that all the emails are relevant, that their relevance outweighs any prejudice, confusion, or other danger listed in Rule 403 of the Delaware Rules of Evidence, and that they are statements by an opposing party under Rule 801 of the Delaware Rules of Evidence. Thus, the objections are overruled. JX 382 is Carole Shorenstein Hays's deposition, and Counterclaim Defendants reserved all objections. The parts of the deposition used in this memorandum opinion were either not objected to or the objections are overruled to the extent necessary to address the request for attorneys' fees. JX 202 is an email from Ray Harris to Robert Nederlander with attached notes taken after the January 28, 2014 board meeting. Counterclaim Defendants object that it is irrelevant, relevant but prejudicial, confusing, misleading, or needlessly cumulative, and contains embedded hearsay. I find that the notes are relevant and that their relevance outweighs any prejudice, confusion, or other danger listed in Rule 403 of the Delaware Rules of Evidence. Further, the embedded statements are not offered to prove the truth of the matter

## A. The Cast: Parties and Relevant Non-Parties

Shorenstein Hays-Nederlander Theatres LLC (the "Company" or "SHN") is a Delaware limited liability company ("LLC") with its principle place of business in San Francisco, California.[2] CSH Theatres L.L.C. ("CSH Theatres") and Nederlander of San Francisco Associates ("NSF Associates") are both fifty-percent members of the Company.[3] CSH Theatres, which is controlled by the Shorenstein-Hays family, is a Delaware LLC with its principle place of business in San Francisco, California.[4] NSF Associates is a California general partnership controlled by Robert E. Nederlander, Sr.[5]

### 1. The Shorensteins

Walter Shorenstein, the patriarch of the Shorenstein-Hays family, founded the Shorenstein Real Estate Company, a commercial real estate company.[6] During his lifetime, Walter set up a series of trusts for the benefit of his daughter, Carole

---

asserted in the statements and, thus, are not considered hearsay under Rule 801 of the Delaware Rules of Evidence. Therefore, the objection is overruled.

[2] PTO ¶ 1.

[3] *Id.*

[4] *Id.* ¶ 2.

[5] *Id.* ¶ 4.

[6] Tr. 8-9 (Holland).

3

Shorenstein Hays,[7] and her family.[8] The two trusts relevant to this case are CSH Doule Trust and CJS Trust-A, which have both been directed trusts since 2012.[9] The CSH Family Office and the Investment Committee manage the investments of both trusts.[10] The Investment Committee consists of Carole, her husband Dr. Jeffery "Jeff" Hays (together with Carole, the "Hayses"), their two children, Wally and Gracie, and Thomas "Tom" Hart.[11] Tom has worked for the Shorenstein family since 1982.[12]

CJS Trust-A wholly owns CSH Theatres, and Tom has managed CSH Theatres since 2010.[13] CSH Curran LLC ("CSH Curran") is a Delaware LLC

---

[7] Carole has been in the theater business for roughly forty years. Tr. 433 (C. Hays). In fact, Walter founded the predecessor to the Company in part because of Carole's love of theater. Tr. 269 (C. Hays). She started her career in the mid-1980s by producing the original production of *Fences*. Tr. 434-36 (C. Hays). *Fences* went on to be an incredible success, winning numerous Tony Awards and a Pulitzer Prize. Tr. 441 (C. Hays). Carole's career followed suit. At the time of trial, twenty of her shows had been nominated for Tony Awards, the highest accolade in the theater industry, and seven had won either best play, best revival, or best musical. CSH Trial Demonstrative 29; Tr. 443 (C. Hays).

[8] Tr. 248-49 (C. Hays); Tr. 682 (Hart).

[9] Tr. 682 (Hart).

[10] Tr. 682-83 (Hart).

[11] Tr. 683-84 (Hart).

[12] Tr. 680 (Hart).

[13] PTO ¶ 2.

4

formed in 2010 with its principle place of business in San Francisco, California.[14]

CSH Doule Trust wholly owns CSH Curran, and CSH-Doule LLC is CSH Curran's "sole controlling member."[15] CSH Doule Trust controls, and Carole and Tom manage, CSH-Doule LLC.[16] In 2010, CSH Curran purchased the Curran Theatre ("the Curran").[17]

Carole served as co-president of the Company from 2000 until June 2, 2014,[18] except for the period from January 15, 2013 to March 16, 2013 when she served as the Company's sole president.[19] Carole also served as CSH Theatre-appointed director of the Company from 2000 until June 2, 2014.[20] Jeff served as CSH Theatre-appointed director of the Company from 2010 until October 27, 2014.[21]

---

[14] *Id.* ¶ 3.

[15] *Id.* ¶ 47.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 5. The LLC Agreement (defined below) entitles CSH Theatres and NSF Associates to each appoint one co-president and two of the four board members. *Id.* ¶ 17.

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 6.

### 2. The Nederlanders

Robert has been NSF Associates-appointed director of the Company since 2000 and co-president of the Company since 2009.[22]  Since 2012, NSF Associates' other appointed board member has been Raymond "Ray" Harris (together with Robert, "the Nederlanders").[23]  James "Jimmy" M. Nederlander, Robert's brother, was the original Nederlander involved with the Company and served as the Nederlander representative until his brother Harry Nederlander was appointed in 1992.[24]  In 2000, Harry's son, Scott Nederlander was appointed co-president of the Company.[25]  Scott served in that role until 2009 when Robert replaced him.[26]

Robert owns a minority interest in, and previously served as president and chief executive officer ("CEO") of, the Nederlander Organization, a company founded by his father David T. Nederlander.[27]  The Nederlander Organization is one of the largest owners and operators of theaters in the United States.[28]  It owns and

---

[22]     *Id.*  Robert was not co-president from January 15, 2013 to March 16, 2013.  *See id.* ¶ 5.

[23]     *Id.* ¶ 12.

[24]     Tr. 451 (C. Hays).

[25]     Tr. 459-60 (C. Hays).

[26]     Tr. 106-07 (Holland); Tr. 432, 461 (C. Hays).

[27]     PTO ¶ 13.

[28]     *Id.*

operates nine Broadway theaters in New York City and at least fifteen other theaters around the United States, including Broadway San Jose, which stages Broadway-style productions at the San Jose Center for the Performing Arts, less than 100 miles from San Francisco.[29]

## B. Synopsis: The Facts

### 1. Act 1: the beginning

The predecessor entity to the Company was a partnership called Shorenstein-Nederlander Productions of San Francisco (the "Partnership").[30] Walter and Jimmy solidified the Partnership in writing in 1978.[31] The Partnership had two general partners—Nederlander of California, Inc., the Nederlander partner, and CSJ Trust-A, the Shorenstein partner (collectively, the "Partners").[32] The original life of the Partnership was from "November 29, 1977 . . . until the expiration of the Curran lease on December 31, 1980," with an option to extend the lease or the life of the partnership by purchasing the Curran.[33] On January 1, 1980, the Partnership entered into a ten-year, written lease (the "Lurie Lease") with the Lurie Company ("Lurie"),

---

[29]     *Id.* ¶¶ 13-14.

[30]     JX 493; JX 494.

[31]     JX 493; JX 494.

[32]     *Id.*

[33]     JX 493-1.

the owners of the Curran.[34]  The Partners extended the Lurie Lease by written amendment in February 1989, October 1990, and October 1997.[35]

In 1990, the Partners sued one another, alleging breaches of the partnership agreement.[36]  In 1992, the Partners settled the litigation and entered into a supplement to the Partnership agreement.[37]  Due to concerns about Nederlander competition,[38] the supplement included new language:

> Both partners will devote their efforts to maximize the economic success of the Partnership and avoid conflicts of interest.  Neither party will stage any production within 100 miles of San Francisco unless (i) it has first played in a Partnership theatre, or (ii) it has been rejected for booking by the other party, or (iii) the Partnership shares in the profits and/or losses of such booking pursuant to an agreement.[39]

On November 6, 2000, the Partnership was converted into the Company by the filing of a Certificate of Conversion and Certificate of Formation with the Delaware Secretary of State.[40]  On the same day, CSH Theatres and NSF Associates

---

[34]     PTO ¶ 37.

[35]     *Id.* ¶ 39.

[36]     JX 495; JX 496.

[37]     JX 361.

[38]     Tr. 833-34 (R. Nederlander).

[39]     JX 361-2.

[40]     PTO ¶ 16.

entered into the Plan of Conversion and Operating Agreement of the Company (the "LLC Agreement").[41]

## 2. Act 2: the LLC

Two articles of the LLC Agreement are relevant to the current dispute: Article 4 and Article 7. Particularly, Section 4.04 Restricted Activities, Section 7.02 Cooperation and Non-Competition, Section 7.04 Nature of Obligations Among Members, Section 7.06 Outside Activities, and Section 7.09 Confidentiality are most relevant.

Section 4.04 requires board approval before the Company can take certain actions including entering into contracts with Affiliates (as defined in the LLC Agreement) or theater leases.[42] Section 7.02(a) confirms that "the Shorenstein Entity and the Nederlander Entity" will "maximize the economic success of the

---

[41]    *Id.* ¶ 17.

[42]    JX 10-14 ("[E]xcept to the extent expressly provided for in the Operating Plan, without the prior approval of the Board of Directors, the Company shall not, and no officer, employee or agent of the Company shall, take any actions with respect to . . . (i) the entering into of any theater leases, concession agreements, merchandising agreements or ticketing agreements . . . (l) any agreements, contracts or transactions (including any amendment, renewal or termination of such agreements, contracts or transactions) with any Member or an Affiliate of a Member . . . (t) any contract for the lease, as lessor or lessee, of any real or personal property, other than office leases entered into by the Company as lessor in the ordinary course of business; . . . .").

9

Company and . . . avoid any conflicts of interests."[43]  Section 7.02(b) creates a 100-mile buffer zone for specific types of competition,[44] while Section 7.06 allows all other competition.[45]

Section 7.04 states, in part, "Except as otherwise expressly provided herein, nothing contained in this Agreement shall cause any Member to be deemed or otherwise treated as an agent or legal representative of the other Members or to

---

[43]  JX 10-24 ("The Shorenstein Entity and the Nederlander Entity hereby agree to devote their efforts to maximize the economic success of the Company and to avoid any conflicts of interests between the Members.  All actions of the Members and their representatives with regard to the Company and theater matters will be carried out in good faith and in a prompt and expeditious matter.").

[44]  JX 10-25 ("Until the termination of the Company pursuant to this Agreement, neither the Shorenstein Entity nor the Nederlander Entity will stage any Production that it controls (as defined in Section 7.03) within 100 miles of San Francisco unless (i) such Production has first played in one of the Theatres; or (ii) such Production has been rejected for bookings at one of the Theatres by the other Member's representative on the Board of Directors; or (iii) the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members.").

[45]  *Id.* ("Subject to the other provisions of this ARTICLE VII, including Section 7.02, any Member, any Affiliate of any Member or any officer or director of the Company shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, and may engage in the ownership, operation and management of businesses and activities, for its own account and for the account of others, and may (independently or with others, whether presently existing or hereafter created) own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities.  Neither the Company nor any Member shall have any rights in or to any independent ventures of any Member or the income or profits derived therefrom.").

10

create any fiduciary relationship for any purpose whatsoever."[46]  Section 7.09

prohibits the disclosure of confidential information of the Company.[47]

In 2001, the Company hired Greg Holland as CEO "to rebuild the SHN staff,

to create in-house marketing, public relations, [and] promotions department for the

company, to manage their ticketing operations as well as the venue operations, and

book the shows into the theaters."[48]  When Greg took the CEO position, he believed

---

[46]     *Id.*

[47]     JX 10-27 to 10-28 ("Each Member recognizes and acknowledges that confidential information of various kinds may exist, from time to time, with respect to the business and assets of the Company and of the other Members or their Affiliates. Accordingly, except as permitted pursuant to Section 10.03 or 10.07 herein, each Member covenants that, except with the prior written consent of the Board of Directors (in the case of information relating to the Company) or the other Members (in the case of information relating to such other Members or their Affiliates), each Member shall at all times keep confidential and not divulge, furnish or make accessible to anyone (except such Member's employees or agents who have a need to know and who agree to be bound by the terms of this Section 7.09) any confidential information to which such Member has been or shall become privy relating to the business or assets of the Company or the other Members or their Affiliates.  The provisions of this Section 7.09 shall not apply to any information to the extent it is or shall become generally known from a source other than a source which is known to be the subject of a confidentiality obligation or if disclosure of such information is required by applicable law, regulation or stock exchange rule (in which case the Member wishing to disclose such information will provide the Board of Directors or the other Members, as the case may be, with at least 10 days' prior notice and reasonable opportunity to comment upon (but not approve) such disclosure) or if disclosure is necessary in connection with an audit of a Member or an Affiliate thereof.").

[48]     Tr. 10 (Holland).  Quotes from trial testimony and email exhibits are presented in their original form except where indicated.  I chose not to include *sic* because it would make some of the testimony and emails unreadable.

11

his job was to follow the LLC Agreement.[49]  But, Greg testified that the LLC Agreement was often followed in "a more casual manner."[50]  For example, Section 7.01 of the LLC Agreement states, in part, "The [c]o-[p]resident appointed by the Nederlander Entity will take the lead in identifying and scheduling [p]roductions for the Theatres . . . ."[51]  In reality, however, Carole, the Shorenstein-appointed co-president, would often identify productions without Robert, the Nederlander co-president.[52]

### 3. Act 3: the turmoil begins

#### a. Scene 1: the purchase of the Curran

In 2010, the Company operated three theaters in San Francisco: the Golden Gate, the Orpheum, and the Curran.[53]  The Company owned, and still owns, the Golden Gate and the Orpheum, but it rented the Curran from Lurie.[54]  The Curran was constructed in 1922 and is located about two blocks west of Union Square in

---

[49]     Tr. 11 (Holland).

[50]     Tr. 11-12 (Holland).

[51]     JX 10-24.

[52]     Tr. 142, 144 (Holland).

[53]     PTO ¶ 34.

[54]     *Id.* ¶¶ 35, 37, 39.

12

San Francisco, right in the middle of the "high-end shopping and tourist district."[55]

Producers prefer the Curran for "sit-down" productions because it most closely resembles a traditional Broadway theater.[56]

In 2009, Lurie offered to sell the Curran to the Company for $30 million, and in January 2010, Lurie lowered the asking price to $17.5 million.[57] Robert was unwilling to purchase the theater, even at the reduced price, but Carole viewed the Curran as a special place and decided to purchase the Curran herself.[58] Everyone agrees that at some point in 2010, Carole asked Robert's permission to purchase the Curran and that he gave his approval.[59] That is where the agreement ends.[60] In either June or October 2010, either by phone or in person, in either one conversation or three, Carole sought Robert's blessing to purchase the Curran. During this/these conversation(s), Carole asked Robert's permission to purchase the Curran, Robert

---

[55] *Id.* ¶ 36; Tr. 22 (Holland).

[56] Tr. 22 (Holland).

[57] PTO ¶ 42.

[58] *Id.* ¶¶ 43-44.

[59] *Id.* ¶ 45.

[60] There is no contemporaneous written evidence that corroborates any particular version of events, and no one witness was any more or less credible than another on this point during trial.

13

may have said something about the lease of the Curran, and if he did, Carole responded in the affirmative.

Robert remembers the conversation(s) (the "Conversation") as:

> What I said to [Carole] is that if [she] bought the Curran Theatre, SHN was necessary that SHN run, operate, the theater, and that we would pay [her] a small amount over the $350,000, maybe 25 or $30,000 for a period of time, an increase over the period. That was what I said we would do. Because she had invested so much money in there, she's entitled to something. And she was happy to agree to buy it, but -- and I gave permission, provided that SHN would run the Curran and the rental would be approximately more than 3 -- that the minimum rental would be more than 350, maybe like $25,000 or so, plus three or four years, five years, going to increase over a period of time. And they would also get – we'd have to work something -- probably keep the same percentage rent.[61]

Robert also remembers there being "a couple conversations. Two or three conversations"[62] on the telephone,[63] but he did not "remember the exact date,"[64] and "[t]here was one, and a short time later, maybe three, four weeks later" there was

---

[61]    Tr. 1004 (R. Nederlander).

[62]    Tr. 881 (R. Nederlander).

[63]    *Id.*

[64]    Tr. 880 (R. Nederlander).

14

another.[65]  When asked if he mentioned "the phrase 'percentage rent'" in the conversation(s), Robert testified, "We talked about minimum rental."[66]

Robert further recalled that Carole called him to say she was going to buy the Curran for $16 or $17 million, and he told her "[t]hat's too much money.  But if you do decide – if you do decide to buy it, I give you permission, provided that the theatre is leased to [SHN]."[67]  Robert testified that he "told [Carole] that if she wanted to buy it, she has my permission, but it's with the understanding and the promise, and the promise, that [she] would lease the theater to SHN. Otherwise, [he] wouldn't give [her] permission."[68]  "She said, 'Okay.'"[69]  Robert "envisioned maybe another $25,000 a year for three or four years [in rent].  And . . . [o]therwise, the lease was the same."[70]

Carole remembered the Conversation differently.  At trial, she confirmed her deposition testimony that Robert tied his permission to purchase the Curran "with

---

[65]     Tr. 885 (R. Nederlander).

[66]     Tr. 1005 (R. Nederlander).

[67]     Tr. 851 (R. Nederlander).

[68]     Tr. 852 (R. Nederlander).

[69]     *Id.*

[70]     *Id.*

15

something to do with a lease."[71]  She testified that the Conversation with Robert happened "at the very, very end of the board meeting as we all stood up and we were ready to go."[72]  Carole confirmed at trial her deposition testimony that she asked Robert, "'We're going to buy it [the Curran].  You know, is it cool with you?' and he said 'Yep. You'll keep the lease going?' I said: 'Yep.'"[73]  She testified that she was always referring to assuming the exisiting Lurie Lease and never had any discussion about a new lease, a renewal of the Lurie Lease, any rental amount, or any term, including duration.[74]

While no one else heard the Conversation between Carole and Robert, other witnesses at trial testified about what they subsequently were told or experienced. Ray and Greg both testified that Robert told them about the Conversation with Carole.  Ray testified by attorney-drafted affidavit that he received a phone call from Robert in the fall of 2010:

> [Robert] said that he agreed to allow [Carole] to buy the theatre in exchange for her promise to renew the Curran lease to SHN for the life of the Company in accordance with the terms of the Lurie [L]ease.  I do not recall if [Robert] mentioned a specific rental amount, but he did say that the rent would be increased in an amount

---

[71]    Tr. 296-97 (C. Hays).

[72]    Tr. 297 (C. Hays).

[73]    Tr. 429 (C. Hays).

[74]    Tr. 430-32, 475-76 (C. Hays).

16

comparable to the increases under the Lurie Lease. [Robert] said that [Carole] agreed to these conditions.[75]

When cross-examined in person at trial, Ray said, "[T]he best I can recall is [Robert] called me and said that Carole had asked if she could buy it personally, as opposed to SHN purchasing it."[76] According to Ray, during that phone call, Robert told him, "he had told [Carole] that he would be okay with that as long as she extended the lease to SHN for the partnership for as long as we had the partnership."[77] Ray further testified, "[Robert] had mentioned that we were going to extend the lease that we had at the Curran Theatre at relatively the same rates,"[78] and "we anticipated that the extension, there would be nominal rent increases based on the rent increases that we'd experienced in the Lurie [L]ease over the last, you know, ten years."[79]

Greg recalled, "I received a phone call from Robert Nederlander telling me that he had just given Carole permission on the phone to purchase the Curran Theatre, and she would purchase it for SHN and then lease back the Curran to SHN

---

[75]     Harris Aff. ¶ 35.

[76]     Tr. 1076 (Harris).

[77]     *Id.*

[78]     Tr. 1077 (Harris).

[79]     *Id.*

17

for the life of the company for SHN."[80]  Greg testified that the same day he also received a phone call from Carole: "Carole Hays called me and said, 'I'm happy to tell you I've purchased the Curran. I've purchased it for SHN. We don't have to worry about competitors. We have it to use. And I will turn it over to SHN as a lease for the life of the company.'"[81]

Tom recalled that at a fall 2010 board meeting, Jeff introduced the topic of one of Carole's trusts buying the Curran, and Tom presented the plan to have the trust do so to the board.[82]  Tom remembered, "[Robert] again said that the price was too high, but he said that if Carole wanted to spend her money, she should go ahead and purchase the Curran if she wished.  [Robert] did not condition his consent in any way."[83]  Tom testified, "[Robert] asked me during the board meeting what would happen to the lease if [Carole's] trust purchased the theatre.  I said that the purchaser would assume the existing lease, and I said nothing at all about any renewed or future

---

[80]     Tr. 23 (Holland).

[81]     Tr. 23-24 (Holland).

[82]     Tr. 710 (Hart).

[83]     Hart Aff. ¶¶ 39-40.

18

lease."[84]   CSH Curran closed its purchase of the Curran for $16.6 million on December 15, 2010.[85]

When Carole purchased the Curran, she did so with the best interests of the Company in mind and with the expectation that she would continue leasing the Curran to the Company past the December 31, 2014 expiration of the Lurie Lease.[86] There was concern that if the Company or Carole did not purchase the Curran, then a direct competitor, like Disney or Broadway Across America, might purchase it instead.[87]   Carole purchased the Curran, and multiple witnesses testified to the general expectation by all the principle players that the lease of the Curran would be renewed.[88]   The Curran was rebranded "SHN Curran Theatre," and the Company began booking shows at the Curran for after December 31, 2014.[89]

---

[84]    *Id.* ¶ 41.

[85]    PTO ¶ 49.

[86]    Tr. 291 (C. Hays).

[87]    Tr. 691-92 (Hart).

[88]    Tr. 196, 215 (Holland); Tr. 291 (C. Hays); Tr. 719 (J. Hays); Tr. 869 (R. Nederlander); Tr. 1199 (Coleman).

[89]    Tr. 37 (Holland); Tr. 342 (C. Hays); JX 175.

### b. Scene 2: Carole wants control

After the purchase of the Curran, Carole grew increasingly frustrated with her business partner. In the wake of her father's death in 2010, she felt that Robert was not interested in forming a relationship with her, and her efforts to form a relationship with him were not reciprocated.[90] Likewise, she was very concerned about Robert's succession plans for the Company.[91] She also "felt maligned, and, indeed, somewhat bullied that [she] was the one who bought [the Curran]."[92] As this frustration mounted, Carole began to focus on obtaining sole control of the Company.

In 2010 or 2011, Carole began instructing Greg to "not communicate with [Robert] or [Ray], nor meet alone with them unless [the Hayses] were present or part of the conversation."[93] At this point in time, Carole and Greg were meeting three or four times a week in San Francisco without any representative of NSF Associates.[94] Greg testified that he continued to communicate with Robert and Ray,[95] but he

---

90      Tr. 463-64 (C. Hays).

91      Tr. 466 (C. Hays).

92      Tr. 485 (C. Hays).

93      Tr. 48 (Holland).

94      *Id.*

95      *Id.*

"became concerned, because there had been a shift in the direction. [And so he hired a] personal attorney and paid for [that] personal attorney to advise [him] on the direction [he] was being given by [Carole]."[96] Greg testified that Carole would often express the opinion that, "she had created the company, that it was her company, that it was all her money that had created the company, and that . . . it was really majority her company."[97]

Carole testified that she felt she was doing the vast majority of the work, and despite her continuing efforts, Robert was not involved in the running of the Company.[98] Carole felt that the LLC Agreement should be changed to reflect that she "was the one going out and doing all the work, having the relationships with the producers, directors, creatives."[99]

---

[96]     Tr. 49 (Holland).

[97]     Tr. 55 (Holland).

[98]     Tr. 348-50 (C. Hays) ("There was no working relationship. I was the one who tried to work with Mr. Nederlander. Phone calls were never returned. I never -- I met with him once in New York, socially at lunch, during this whole time and never once did he really talk about business and the issues that I wanted to discuss."); Tr. 359 (C. Hays) ("I was the only person there, in that I never got a phone call back from Mr. Nederlander, in that he never went to shows, in that he was unaware of what was going on at our office in New York, in London. Whether or not I viewed it as my business, that was a fact. He was not there. He was in absentia.").

[99]     Tr. 350 (C. Hays) ("I knew that it was very hard to discuss business with him, and I also knew that I was out there identifying the shows, identifying projects before they were even happening, trying to explain to Mr. Nederlander the importance of being a player on Broadway. And that's why it's called show business, not just waiting for the phone to ring.").

21

In a January 2012 email, Carole wrote to Tom, "it just seems that the partnership has grown and evolved since it was originally drawn up....and goodness, within me, dare I say, the Organization would be quite different, we should perhaps look at the whole document....it's important that I maintain CONTROL . . . so I might suggest this is the IDEAL time to completely restructure the Partnership Agreement ...."[100] In October of 2012, Carole emailed Jeff and Tom, suggesting that the new lease for the Curran "should lead to [a] new management agreement."[101] Carole testified that at the time she considered it "silly business to agree to a lease without a new management agreement," but if Robert had come forward when she purchased the Curran and "said 'even though I feel you've overspent, let's roll up our sleeves and do a new lease,' that would have been great. And none of this would have been an issue."[102] In January 2013, Carole emailed Tom saying, "I think it is time together a new management agreement in place, Tom. Succession and fees are

---

[100]     JX 71 (omissions in original); Tr. 351-52 (C. Hays). Somewhat confusingly, at trial, Carole testified that she did not want a new agreement to put her in control. Tr. 357 (C. Hays) ("Q. And all I'm asking you, Mrs. Hays, is: You used the lease as a leverage over Mr. Nederlander to help you get the new operating agreement to put you in control of SHN; correct? A. Never to put me in control. So incorrect.").

[101]     JX 101; Tr. 353 (C. Hays).

[102]     Tr. 558-59 (C. Hays).

22

key.  This is the appropriate time to involve [our lawyer] and get clarity.  I firmly believe that to start with the curran lease is foolish.  We are in the prime spot."[103]

In addition to tying the Curran lease to a new management agreement, Carole had other ideas about how to convince Robert to amend the LLC Agreement.  In January 2013, Carole sent several emails discussing the idea of refusing to allow the Company to make any distributions until a new LLC Agreement was in place.[104]  At trial, Carole refused to acknowledge that she had ever had this idea or made any suggestion to threaten withholding distributions until a new LLC Agreement was in place.[105]

---

[103]     JX 129.

[104]     JX 127 ("[I]t's just the right time for a new management agreement and new structure.  And I feel strongly that we stand firm on that and refuse to have a distribution til this is all worked out to our satisfaction."); JX 130 ("I'm just wondering if…. Now is the time to put a brief halt to distribution and to tie it all to a new operating agreement.  There's just so much that is of a different era, Tom and just think that if we don't tie it to funds then …. Really …. What leverage do we have?  Just wondering"); JX 131 ("I do feel strongly that the distribution should be us subjected to a new operating agreement . . . I say 100% I have grave reservations of releasing any funds whatsoever UNTIL a new management agreement is in place because…. IF NOT NOW….when").

[105]     Tr. 361 (C. Hays) ("You did say on multiple occasions, Mrs. Hays, that it was your firm belief that you would not approve partnership distributions until you got a new operating agreement; right?  A. There were always distributions made in the end.  Q. Notwithstanding the fact that on multiple occasions you said it was your firm belief those distributions should not occur until you got a new operating agreement; correct?  A. There were always distributions made.").

23

At the January 14, 2013 board meeting, Carole acted on her desire for more control. Greg testified:

> Carole stood in front of the door and told us that no one was leaving until she got what she want -- wanted. And then she just started saying that she wanted to control the company. No one had thanked her for buying the Curran Theater for the company, and she didn't feel she deserved to be treated that way. [Robert] thanked her several times. She kept pressing that she -- you know, she deserved to have control of the company, that I wasn't providing her information. And after what felt like a long, long period of time, [Robert] agreed that she would be the sole president of SHN for a 60-day period, and that he wanted -- part of that job for her would be that she would increase sponsorships and lower costs.[106]

### c.     Scene 3: the lease negotiations

While Carole was discussing ways to get a new LLC Agreement, Tom and Ray were negotiating a lease renewal between the Company and CSH Curran.[107] In August 2012, Tom emailed the Hayses and assured them that they were "entitled to a fair return on [their] investment of the appropriate $17M in the Curran. Presently [the] rent return is $350K annually which is approximately 2.05%. I know that [Robert] would like a new 10-year lease which I believe should reflect a minimum return to begin of approximately 3% and can scale up in years 5 and beyond to 4%

---

[106]     Tr. 51-52 (Holland).

[107]     As of 2011, the staff of the Company were told they would not be involved in the discussions about the lease. Tr. 209 (Holland).

and 5% returns."[108]   A few days later, on August 28, 2012, Tom informed the Hayses, "I spoke with Robert Nederlander. He asked that he see the Curran lease proposal prior to the September 11, 2012 SHN Board Meeting."[109]

On August 29, 2012, Tom, as representative for CSH Theatres and CSH Curran, sent an email to Ray, as representative for NSF Associates.[110]   In that email, Tom outlined the rent terms for a proposed ten-year lease to begin on January 2, 2013.[111]   The next day, Ray forwarded that email to Robert.[112]   According to the meeting minutes, the board discussed the "Curran Theatre Lease" at their September 11, 2012 meeting.[113]   On October 19, 2012, Ray emailed Tom a counterproposal with rent terms for a twenty-year lease to commence on January 1, 2015.[114]   The minutes from a January 15, 2013 board meeting reflect that the board discussed a "new lease" for the Curran.[115]

---

[108]   JX 84.

[109]   JX 87.

[110]   PTO ¶ 53.

[111]   *Id.*

[112]   *Id.* ¶ 54.

[113]   JX 94.

[114]   PTO ¶ 55.

[115]   JX 134.

By December 2013, the parties were still working towards agreement on a lease or lease renewal for the Curran.[116] In October 2013, Tom sent Jeff a draft proposal to counter the October 19, 2012 proposal.[117] On December 20, 2013, Ray re-sent his October 19, 2012 counterproposal.[118] On January 10, 2014, Tom emailed the Hayses another draft proposal saying, "On Tuesday I distributed to all of you a suggested lease renewal scenario for the Curran Theatre and we should review and discuss with [Ray] and [Robert]. They are prepared to outline the terms of the renewal prior to the [January 28] board meeting. They would be accepting of a 10 year agreement."[119] The terms in this email were never sent to any representative of NSF Associates or the Company.[120] The Board of Directors then met on January 28, 2014.

### 4. Act 4: the parting of ways

The mounting tensions finally reached a breaking point at the January 28, 2014 board meeting. At the January 28 meeting, the last item on the meeting agenda was the lease for the Curran, which Carole, Jeff, Tom, Robert, and Ray discussed in

---

[116]    JX 249.

[117]    JX 173.

[118]    PTO ¶ 58; JX 181.

[119]    JX 190.

[120]    PTO ¶ 60.

an "executive session."[121] During the executive session, the Hayses informed the Nederlanders that they would not entertain any conversations about the lease of the Curran until a new LLC Agreement "was contemplated."[122] Robert was resistant to the demand, but Carole informed him she would not approve the next year's subscription[123] unless a new LLC Agreement was adopted.[124] Carole testified that she wanted a new LLC Agreement because the LLC Agreement needed "to be more reflective of the time in which [they] lived, in that [Robert] was never in San Francisco, in that [she] could never get [Robert] on the phone, in that it became apparent that [Greg and Robert] were in constant communication and aligning."[125] In fact, Carole admitted at trial that if the Nederlanders had agreed to a new LLC Agreement that gave her control, she would have approved the lease "in a

---

[121]  JX 202-2.

[122]  Tr. 378 (C. Hays) ("Q. What you told the Nederlanders at that meeting, you and your husband, is, 'We will not entertain conversations about the lease unless we get a new operating agreement;' correct? A. Correct.").

[123]  "A subscription, really everywhere in the country for Broadway, is five to seven shows that are put in a package that you buy at once, similar to a sports season ticket. Subscribers get special benefits, typically discounts, opportunity to get gifts, better seats than everywhere else." Tr. 82 (Holland).

[124]  Tr. 379 (C. Hays) ("Q. And when Mr. Nederlander resisted, you said you would not even approve SHN's subscription series for the year if you didn't get a new operating agreement; right? A. I said that, and there was a subscription that was approved in the end.").

[125]  Tr. 488 (C. Hays).

27

heartbeat."[126]  Greg recalled that on January 28, for the first time ever, no one reported to him what had happened at the executive session: "Rather than someone reporting back what had happened in that executive session, I just observed all the board members leaving and Tom Hart leaving the theater and getting in cars."[127]

On January 28, at some point after the meeting, Tom emailed the Hayses and their attorneys about a phone conversation he had just had with Ray regarding the January 28 board meeting:

> [Ray] indicated that he and Robert didn't like being threatened by either holding the Curran lease renewal over their heads or Carol threatening to sabotage the business by not approving the 2014 Subscription Series. I assured him that the Curran is a separate matter and that there are larger problems that we want to address. I said that I thought that [Carole] was expressing her frustration with this two-headed decision making. [Ray] believes that if they were to give up control that it could create uncontrolled spending in the business. . . . They were offended that we wanted control but offer nothing for it. I said that to the contrary, that this could be structured many different ways; from a complete buyout to a modification of the LLC agreement giving Carole control (with a minority right) which could accrue some value to the overall business or directly to the Nederlanders. He said make us an offer.[128]

---

[126]    Tr. 379 (C. Hays).

[127]    Tr. 58 (Holland).

[128]    JX 199.

28

On February 4, 2014, Ray emailed the Hayses, copying Tom and Greg, to

express his and Robert's dismay at the events of the January 28 board meeting:

> We were shocked at our last board meeting in San Francisco last Tuesday when Jeff informed us in executive session that the Shorenstein Group wanted to change the company's operating agreement and give control of the company over to the Shorenstein Group. Further, you wanted Robert Nederlander to relinquish his Co-Presidency of SHN and establish Carole as the sole President of the company. Carole also stated that if we didn't agree to these significant changes and give her control she would not approve the release of the new subscription series. . . . It should be noted that Robert Nederlander negotiated long and hard with the sellers of the Curran, and then turned the matter over to Carole with the understanding that upon the purchase of the Curran by Carole she would renew the company's lease. However, given your statements in the meeting, we feel that it is highly unlikely that the company will now get a satisfactory or timely renewal of the Curran Lease. . . . We note that Section 7.02(a) of the operating agreement requires each member to "devote their efforts to maximize the economic success of the Company and to avoid any conflicts of interest between the Members." This requirement must guide all of the partners' actions relating to business decisions. If you insist on taking actions which violate your obligations under the operating agreement, then we will be forced to evaluate our legal rights and remedies.[129]

---

[129] JX 203.

29

On February 12, the Hayses responded with their position as to control of the Company and their disagreement with the Nederlanders' representations about the Curran:

> It is quite unfortunate if our discussion on January 28 was misconstrued as a "demand," as that certainly was not our intention.
>
> . . .
>
> Our discussion was intended to alert you that we are dissatisfied with the arrangement as it exists today. There is no clear agreement between the members as to direction and the resulting uncertainty is harmful to the Venture and very unsettling. We propose to revise the arrangement, among other things, by eliminating the notion of shared control – which in the current time and with the present individuals, is highly inefficient, and, we believe, sometimes counterproductive to the Venture's interests. In our view, something has to change. Your memo merely confirms the deep-seated differences between the members.
>
> . . .
>
> As for the Curran theatre, here again your memo ignores reality. CSH fully supported the proposal that the Venture purchase the theatre, and Tom Hart, at our request and expense, spent countless time over a period of years trying to find terms that would be acceptable to the seller and then later to find financing. But, Bob, you ultimately were not willing to authorize the Venture to move forward. You didn't "turn over the matter to Carole….", you simply advised that you would not approve the purchase at the seller's price, which meant that the Venture could not proceed. At that point, it became possible for the current landlord to step up and complete the purchase. As you implicitly acknowledged, there was no contractual

undertaking from CSH, or from the ultimate purchaser, about terms for a renewal of the lease.[130]

On February 18, the Nederlanders responded in part:

> The history that led to the CSH purchase of the Curran is important. Walter Shorenstein asked Robert Nederlander to negotiate on behalf of the Partnership to extend the Lease or purchase the Curran. The owners were asking for $30 million. Through strong negotiating, Robert was able to reduce the price into a more reasonable range. At that point Carole entered the picture and wished to purchase the Curran herself. Robert agreed to this only with Carole's promise to extend the Lease to the Partnership for the life of the Partnership.[131]

The damage was done.[132] On February 14, Carole emailed Jeff, "I/we want Freedom from the Nederlanders. And if they are unprepared to sell, then we should consider the process of selling. This is not a healthy relationship period period period and a few exclamation points thrown in."[133] On February 24, 2014, the Hayses filed

---

[130]   JX 217.

[131]   JX 228.

[132]   Tr. 59 (Holland) ("[A]s we went into the spring of 2014, Carole just wasn't present with the company very much [so I asked her], 'But, Carole, why are we going through this?' And she said, 'Because I can't let the Curran Theatre stay with the Nederlanders, and I can't stay in a place where no one appreciates me or thanks me.'").

[133]   JX 222-3.

31

suit in Delaware seeking a declaratory judgment regarding their rights and obligations under the LLC Agreement.[134]

The Hayses then actively started planning a new venture at the Curran.[135] On June 2, 2014, Carole resigned as co-president and director of the Company.[136] Things continued to deteriorate between the Nederlanders and the Hayses. Carole testified that she thought the employees of the Company would follow her to the Curran out of "a sense of loyalty."[137] Greg testified about a phone call between him and Tom:

> I think in the spring of 2014, [Tom] asked if I would ever go to work at the Curran Theatre. And I told him that I didn't think it was an appropriate conversation for us to be having, but that I couldn't imagine leaving SHN and going to manage just the operations at one theater.[138]

On August 2, 2014, Carole emailed Jeff some of her "thoughts for today" which included, "most of all: Going at [Greg] and [Robert] with 'guns ablaze' from others."[139]

---

134     JX 232.

135     *See, e.g.*, JX 222; JX 238; JX 242; JX 243; JX 253; JX 263; Tr. 386-87 (C. Hays).

136     PTO ¶ 61; JX 265.

137     Tr. 498 (C. Hays).

138     Tr. 68 (Holland).

139     JX 291.

Despite the animosity between the parties, and Carole actively competing with the Company, Jeff remained a director of the Company. He attended a board meeting on June 24, 2014, after which he sent a summary of the meeting to his lawyers and copied Carole.[140] The email states:

> Just completed an SHN Board meeting, with Ray Harris, Greg Holland, Joe Coleman (CFO) and an outsourced young attorney to act as Secretary and take notes (my insistence), with Bob Nederlander calling from London.
> I will forward copies of the minutes when they are provided,,, highlights included;
>
> Nederlander asking to alter the Operating Agreement to do away with Co-President positions… but that we would need to consider any changes to the OA within the context of a full review of the Operating Agreement.
> They want me to sign a non-compete document, with emphasis on my not disclosing discussions about SHN booking negotiations. My response; Glad to consider (under advisement) any proposals.
>
> They want to eliminate Wally's position… My response; That would seem to be between the employee and his employer (Greg)… referring to Section 1. Of Greg's contract in which it is stated Executive will have the authority to hire, fire, etc. ,,,,and that I defer to Greg's decision.
>
> They want to fire Paula, Carole's assistant, from the half-time SHN position. My response Again, deferred to Greg's decision.
>
> Greg plans on informing Curran operations staff that the Curran will no longer be under SHN control, and that their

---

[140]    JX 274; Tr. 671 (J. Hays).

33

employment will be ending. (note… I will ask him for a memo on his discussion with staff, so that we can determine when/if CSH might offer positions to key employees (i.e. House Manager, House Engineer, etc.)… We would probably need to hire them, essentially, on a retainer until the theatre would be ready for operation (perhaps a year or more). They are union members.

Discussion about liquor licenses… I asked Greg for a full memo on ownership, etc of the three licenses.

Patient in the waiting room….. more later………….. thanks…JPH[141]

On October 27, 2014, Jeff resigned as director of the Company.[142]

### 5.      Act 5: the new Curran

On August 1, 2014, Carole, through the entity CSH Productions, LLC, invested $1 million in the musical *Fun Home*.[143] As part of her investment she was given certain rights, including a contractual obligation on the part of *Fun Home* to "endeavor to present the opening engagement at the Curran in San Francisco, taking into consideration the schedule and availability of the Curran. . . . In any event, we will not present the Play in any other Bay Area theatre without your prior approval."[144]

---

[141]      JX 274 (omissions in original).

[142]      PTO ¶ 64.

[143]      *Id.* ¶ 63.

[144]      JX 290-3.

The Company's lease of the Curran expired on December 31, 2014.[145] In 2015, the Hayses embarked on a multi-year, multi-million dollar renovation of the Curran.[146] The Curran reopened in 2017, and CSH Curran presented Tony Award-nominated Broadway musical *Bright Star* and Tony Award-winning Broadway shows *Fun Home* and *Eclipsed*.[147] CSH Curran also entered into production deals with *The Last Two People on Earth* and *The Encounter*.[148] The Tony Award-winning play *Harry Potter and the Cursed Child* will be performing a sit-down production at the Curran sometime in 2019.[149]

## II. ANALYSIS

"To succeed at trial, 'Plaintiffs, as well as Counterclaim–Plaintiffs, have the burden of proving each element . . . of each of their causes of action against each Defendant or Counterclaim–Defendant, as the case may be, by a preponderance of the evidence.'"[150] To prove something by a preponderance of the evidence means

---

[145] PTO ¶ 66.

[146] Tr. 492 (C. Hays).

[147] PTO ¶ 70.

[148] *Id.* ¶ 71.

[149] Countercl. Pl.'s Letter to the Ct. (July 3, 2018); Countercl. Defs.' Letter to the Ct. (July 13, 2018).

[150] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) (quoting *inTEAM Assocs., LLC v. Heartland Payment Sys.,*

to prove that something is more likely than not.[151] The claims at issue in this case fall into three broad categories: (1) those concerning the lease of the Curran; (2) those concerning breaches of the LLC Agreement; and (3) those concerning breaches of fiduciary duty. For the reasons set forth below, the Court finds that there was not an enforceable contract, lease, or promise to lease the Curran to the Company; that Counterclaim Plaintiff has not shown CSH Curran is breaching the LLC Agreement, and CSH Curran is allowed to continue to show Broadway-style shows at the Curran subject to Section 7.02(b) of the LLC Agreement; and that the Jeff and Carole breached various fiduciary duties that they owed to the Company.

## A.     The Contract or Lease[152]

Counterclaim Plaintiff advances four legal theories to support its requests for specific performance and damages related to its contention that Carole promised to renew the lease of the Curran: (1) Carole and Robert had an enforceable contract to renew the lease of the Curran to the Company; (2) Carole and Robert agreed to an

---

*Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016), *aff'd*, 177 A.3d 610 (Del. 2017).

[151]     *Id.*

[152]     The disagreement about the lease of the Curran is a disagreement about a lease of real property in California. This implies that California law would apply. The parties, however, have briefed this entire issue under Delaware law. Taking my lead from the parties, I assume that there are not material differences between California and Delaware law, and I apply Delaware law.

36

enforceable oral lease renewal between CSH Curran and the Company; (3) Carole's promise to lease the Curran to the Company should be enforced under the doctrine of promissory estoppel; and (4) Carole made an enforceable promise to negotiate the lease renewal in good faith. For the reasons set forth below, all of these theories fail.

### 1. Counterclaim Plaintiff has not met its burden to show Carole made the purported promise

Each legal theory advanced by Counterclaim Plaintiff hinges on the substance of a discussion between Carole and Robert (defined above as the "Conversation"). Counterclaim Plaintiff alleges that during the Conversation, Carole promised Robert she would renew the lease of the Curran after the expiration of the Lurie Lease (the "Promise"). The parties agree that there is no contemporaneous writing to evidence the Conversation or the Promise. Instead, the only evidence submitted is testimony.[153] For the reasons discussed below, I find that Counterclaim Plaintiff has failed to meet its burden to show that Carole made the Promise.

At trial, Robert testified, "I told Carole Shorenstein that if she wanted to buy [the Curran] she has my permission, but it's with the understanding and the promise,

---

[153] PTO ¶ 45. There is also no dispute that no new written lease nor any written modification, amendment, or extension of the Lurie Lease was ever signed by the Company. *Id.* ¶ 65.

and the promise, that [she] would lease the theater to SHN.  Otherwise, I wouldn't give [her] permission.  . . . She said, 'Okay.'"[154]  He also testified:

> What I said to [Carole] is that if [she] bought the Curran Theatre, SHN was necessary that SHN run, operate, the theater, and that we would pay [her] a small amount over the $350,000, maybe 25 or $30,000 for a period of time, an increase over the period.  That was what I said we would do.  Because she had invested so much money in there, she's entitled to something.  And she was happy to agree to buy it, but -- and I gave permission, provided that SHN would run the Curran and the rental would be approximately more than 3 -- that the minimum rental would be more than 350, maybe like $25,000 or so, plus three or four years, five years, going to increase over a period of time.  And they would also get – we'd have to work something -- probably keep the same percentage rent.[155]

Robert remembers the conversation taking place on the telephone, and there may have been as many as three different conversations.[156]  He acknowledged there was a conversation about the lease after a board meeting in 2010, but all that was said was "we need to get going on the lease" because the Conversation about permission had taken place earlier and on the telephone.[157]

---

[154]    Tr. 852 (R. Nederlander).

[155]    Tr. 1004 (R. Nederlander).

[156]    Tr. 889 (R. Nederlander).

[157]    Tr. 889-90 (R. Nederlander).

Carole testified at trial that she asked Robert's permission to purchase the Curran after a board meeting in or around October 2010, but she did not promise to rent the Curran to the Company after the expiration of the Lurie Lease.[158] She also testified that Robert did not tie his permission to buy the Curran to the lease of the Curran.[159]

Greg testified at trial:

> I recall that I received a phone call from Robert Nederlander telling me that he had just given Carole permission on the phone to purchase the Curran Theatre, and she would purchase it for SHN and then lease back the Curran to SHN for the life of the company for SHN. Really, the same day Carole Hays called me and said, "I'm happy to tell you I've purchased the Curran. I've purchased it for SHN. We don't have to worry about competitors. We have it to use. And I will turn it over to SHN as a lease for the life of the company.[160]

In his deposition, however, Greg testified that the first time he heard about a promise to lease the Curran to the Company was in a conversation between Robert and Walter

---

[158]    Tr. 492 (C. Hays).

[159]    Tr. 294 (C. Hays).

[160]    Tr. 23-24 (Holland).

39

in 2009 or 2010.[161]  Greg confirmed at trial that his deposition testimony was accurate.[162]

Tom testified at trial that at a board meeting in October 2010, "we were finishing up with the business and ready to go. We had already discussed the Curran, the acquisition. And I was getting up and [Robert] was across the table from me, and he said, 'What about the lease?' And I replied, as I was standing up, 'There is a lease, and we are going to assume it, as the purchaser.'"[163]  Tom also testified that it was Jeff who asked permission to purchase the Curran at the October 2010 board meeting.[164]  Jeff testified at trial that to the "best of his recollection" prior to February 18, 2014, no one, including Robert or Ray, made the assertion that Carole had made a promise to extend the Lurie Lease.[165]

There are significant, irreconcilable discrepancies in the testimony presented about the Conversation.  Robert could not recall when the purported phone call with Carole took place, finally settling on June 2010.[166] Robert also testified that he spoke

---

[161]    Tr. 201 (Holland).

[162]    Tr. 203 (Holland).

[163]    Tr. 708, 711-12 (Hart).

[164]    Tr. 710 (Hart).

[165]    Tr. 678 (J. Hays).

[166]    Tr. 885 (R. Nederlander).

40

on the phone with Carole "two or three" different times to give his permission.[167]

But, Carole testified that the conversation where she asked Robert's permission took place after a board meeting in the fall of 2010.[168] She readily admits that she asked his permission,[169] but not due to the belief that she had a legal requirement to do so, merely because she wanted to be a good partner.[170] She also admits that Robert asked her about the lease, but she thought he meant the existing Lurie Lease, which still had more than three years left.[171] Thus, it is not even clear that Robert and Carole were discussing the same lease during the Conversation.[172]

---

[167] *Id.*

[168] Tr. 492 (C. Hays).

[169] Tr. 294 (C. Hays) ("I did speak with [Robert]. I did get permission. I don't know if I was required to.").

[170] Tr. 335-36 (C. Hays).

[171] Tr. 297, 301, 327 (C. Hays).

[172] At best, Counterclaim Plaintiff has shown that Carole and Robert mutually assented to two entirely different things—Carole agreed to assume the Lurie Lease while Robert believed he had secured a lease renewal for when the Lurie Lease expired. Delaware follows the Restatement Second of Contracts which states that when "a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake." Restatement (Second) of Contracts § 152 (1981); *Morgan v. Scott*, 2014 WL 4698487, at *3 (Del. Sept. 22, 2014) (TABLE). Neither party raised mutual mistake so I do not address it further here.

Written and uncontroverted evidence also exposes certain inaccuracies that discredit the testimony. For example, Robert testified that Carole made the Promise in June.[173] Carole testified that she asked permission in or around October.[174] Carole did not purchase the Curran until December.[175] Therefore, the Promise and the purchase did not happen on the same day, making Greg's account of events implausible. Moreover, there are several writings where the absence of any reference to the alleged contract between Robert and Carole or the Promise is conspicuous. For example, no one mentions the alleged prior agreement between Robert and Carole when Ray received Tom's rent proposal in August 2012 or when Ray sent his rent counterproposal to Tom in October 2012, despite the fact that both have significantly different rent and duration terms than Robert claims Carole agreed to during the Conversation.[176] Likewise, in Ray's contemporaneous notes about the events of the January 28, 2014 board meeting, Robert's response to the Hayses taking the Curran lease off the table was "that Shorenstein couldn't unilaterally change the terms of the partnership."[177] The notes do not show that anyone said

---

[173]     Tr. 885 (R. Nederlander).

[174]     Tr. 492 (C. Hays).

[175]     PTO ¶ 49.

[176]     JX 104.

[177]     JX 202-3.

42

anything about a preexisting agreement to renew the lease of the Curran.[178] In fact, the first time that anyone mentions the Conversation is on February 4, 2014, when Ray emails the Hayses, Tom, and Greg about the January 28 board meeting and says, "It should be noted that Robert Nederlander negotiated long and hard with the sellers of the Curran, and then turned the matter over to Carole with the understanding that upon the purchase of the Curran by Carole she would be renew the company's lease."[179] The first time the Nederlanders mentioned the Promise is in a February 18, 2014 letter to the Hayses threatening legal action unless the lease is renewed.[180]

Ultimately, all the testimony at trial was given after years of contentious litigation. Based on the testimony and all the other evidence presented at trial, I find that Counterclaim Plaintiff has not shown by a preponderance of the evidence that Carole promised to rent the Curran to the Company after the expiration of the Lurie Lease.

### 2. Even if Carole made the Promise, there is no enforceable contract due to lack of consideration

The first legal theory advanced by Counterclaim Plaintiff is that Carole and Robert had an enforceable contract to renew the lease of the Curran. Even assuming

---

[178]    *Id.*

[179]    JX 206-1.

[180]    JX 228-2.

43

that Carole did promise to lease the Curran to the Company after the expiration of the Lurie Lease, Counterclaim Plaintiff has failed to prove that the exchange formed an enforceable contract.

"In Delaware, the formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and consideration."[181] "A valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[182] Counterclaim Plaintiff casts the consideration as the exchange of Carole's promise to lease the Curran to the Company for Robert's permission to purchase the Curran, which it contends was legally required. Counterclaim Defendants argue that Robert's permission was not required to purchase the Curran; therefore, his permission cannot constitute consideration.

Counterclaim Plaintiff argues that "because [Carole's] purchase [of the Curran] constituted a related-party transaction whereby [Carole] would own the landlord and 50% of the tenant, and in light of the LLC Agreement requirement that Members avoid conflicts," Carole needed Robert's approval to purchase the

---

[181] *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006).

[182] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

Curran.[183]  Counterclaim Plaintiff points to two section of the LLC Agreement to support this proposition: Section 4.04 and Section 7.02(a).

Section 4.04 of the LLC Agreement actually works against Counterclaim Plaintiff for two reasons.  First, Section 4.04 lays out a series of "Restricted Activities" that require prior approval by the Board of Directors before they can be done on behalf of the Company.[184]  These include entering into a theater lease,[185] "any agreements, contracts, or transaction (including any amendment renewal or termination of such agreements, contracts or transactions) with any Member or an Affiliate of any Member,"[186] and "any contract for a lease of any real or personal property, other than office leases entered into by the Company as lessor in the ordinary course of business."[187]  If the Conversation amounted to a contract to renew the lease (or an actual renewal of the lease) of the Curran between Robert, acting as an agent for the Company, and Carole, as an Affiliate of CSH Theatres, then the contract would have required approval by the Board of Directors.

---

[183]  Countercl. Pl.'s Opening Br. 35.

[184]  JX 10-14.

[185]  JX 10 § 4.04(i).

[186]  *Id.* § 4.04(l).

[187]  *Id.* § 4.04(t).

Section 4.01 of the LLC Agreement says that each "Member shall appoint two representatives to the Board of Directors" and "all decisions of the Board of Directors shall require a majority vote of those present and voting at a meeting."[188] Counterclaim Plaintiff has not argued that the Conversation took place at a board meeting, nor has it argued that the Conversation between Robert and Carole constituted board approval. Therefore, under Counterclaim Plaintiff's theory, the Conversation would have been insufficient to constitute approval under Section 4.04 and would not be sufficient consideration.

Second, it was Robert, not Carole, who would have needed permission under Section 4.04. Robert was the one purporting to act on behalf of the Company and enter into a contract or renew the lease. Carole was acting on behalf of herself, her trust, or CSH Curran, not the Company.[189] Thus, Robert's permission would not be consideration for Carole's promise to lease the Curran to the Company.

Section 7.02(a) is no more useful to Counterclaim Plaintiff. It states, "The Shorenstein Entity and the Nederlander Entity hereby agree to devote their efforts to maximize the economic success of the Company and to avoid any conflict of

---

[188]    JX 10-10.

[189]    Section 4.04(c) requires board approval before *the Company* can acquire or lease an asset from a third party. JX 10-14. This still would not require that *Carole* get board approval for her purchase of the Curran because it is not the Company making the purchase.

interests between the Members."[190]   But, Section 7.06 of the LLC Agreement

expressly allows "any Member, any Affiliate of any Member, or any officer or

director of the Company . . . [to] own interests in the same properties as those in

which the Company or the other Members own an interest without having or

incurring any obligation to offer any interest . . . to the Company . . . ."[191]   Further,

"no other provision of [the LLC Agreement] shall be deemed to prohibit any such

Person from conducting such other businesses and activities."[192]   Counterclaim

Plaintiff does not explain how the purchase of the Curran created a conflict of

interest that is not allowed by Section 7.06.[193]   Therefore, Counterclaim Plaintiff has

not shown that Robert's permission was legally required for Carole to purchase the

Curran.

---

[190]   JX 10-24.

[191]   JX 10-25.

[192]   *Id.*

[193]   Counterclaim Plaintiff argues that this Court previously held that Section 7.02 of the LLC Agreement required [Carole] to obtain permission from NSF Associates to buy the theatre." Countercl. Pl.'s Opening Br. 67.  This is incorrect.  In his Motion-to-Dismiss Memorandum Opinion, Vice Chancellor Parsons did not hold that 7.02 required Carole to have Robert's permission to purchase the Curran.  Vice Chancellor Parsons held that at the motion-to-dismiss stage it as reasonably conceivable that Counterclaim Plaintiff could, at a later date, show that permission was required due to a conflict of interest. *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *15 (Del. Ch. Apr. 21, 2015).

The circumstances of this case, where Carole has repeatedly testified that she only asked permission to "be a good partner,"[194] show that Carole asked Robert about the purchase of the Curran as a courtesy. Counterclaim Plaintiff has given no reason that the permission would constitute consideration, other than arguing that it was legally required, which it was not. Therefore, the permission does not constitute consideration such that a contract was formed.

### 3. Even if Carole made the Promise, there is no enforceable lease renewal because the parties did not intend to be bound

The second legal theory advanced by Counterclaim Plaintiff is that Carole and Robert agreed to an enforceable lease renewal. In *Osborn ex rel. Osborn v. Kemp*, the Supreme Court of Delaware "set forth the elements of a valid, enforceable contract. [The Court] explained that 'a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration.'"[195] Here, Counterclaim Plaintiff has failed to show that the parties intended to be bound by a lease renewal because they never finished negotiating the essential terms of the renewal.

---

[194]    Tr. 302-03, 325, 336 (C. Hays).

[195]    *Eagle Force Hldgs., LLC v. Campbell*, 2018 WL 2351326, at *1 (Del. May 24, 2018) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

48

In *Leeds*, Chancellor Allen observed:

> Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract. Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative.[196]

The Delaware Supreme Court has stated that "common sense suggests that parties to . . . any agreement[] would not intend to be bound by an agreement that does not *address* all terms that they considered material and essential to that agreement . . . ."[197] Therefore, "all essential or material terms must be agreed upon before a court can find that the parties intended to be bound by it and, thus, enforce an agreement as a binding contract."[198] Delaware law recognizes that "the rental rate and duration of a lease are essential terms,"[199] and the evidence shows that the parties considered rent and duration essential terms of their lease renewal. The

---

[196] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1102 (Del. Ch. 1986).

[197] *Eagle Force*, 2018 WL 2351326, at *16.

[198] *Id.*

[199] *The Liquor Exch., Inc. v. Tsaganos*, 2004 WL 2694912, at *4 (Del. Ch. Nov. 16, 2004).

evidence also shows that the parties never came to an agreement about the rent or duration.[200]

Not much is consistent in this case, but the parties have been consistent about which terms they considered essential: rent and duration. Robert testified that the Conversation included a discussion of rent and duration.[201] Two years later, when the parties exchanged their initial draft proposals, the only terms discussed were rent and duration.[202] On August 29, 2012, Tom sent Ray a "new 10 year lease of the Curran," which included two minimum rent schedules.[203] These rent schedules included a "significant" increase in minimum rent compared to the Lurie Lease.[204] Under the Lurie Lease, the minimum rent for each year from 2010-2014 was

---

[200] Nor is it clear whether the parties were negotiating a renewal of the Lurie Lease or a new lease entirely. Regardless, there is no evidence that the parties discussed relevant terms that would have to be changed. For example, Walter, Carole, and Robert guaranteed the Lurie Lease, but there was no discussion about who would guarantee the lease after December 31, 2014. Tr. 802 (Hart). There were discussions about needed renovations for the Curran, but the parties never agreed on who would bear the costs of those renovations. JX 104.

[201] Robert's testimony about whether there was an *agreement* on rent and duration, and the particulars of that agreement was not even consistent with itself, however. This, in part, is why I do not find his testimony about the Conversation credible.

[202] JX 88; JX 104.

[203] JX 88-1.

[204] Tr. 1026 (R. Nederlander).

$350,000.[205]  The August 29 proposal had a minimum rent in 2013 of $500,000, which increased to $800,000 by 2018.[206]  Ray received the rent proposal without commenting on the significant difference between the proposal and the terms Robert allegedly negotiated with Carole two years earlier.  Ray then sent a counterproposal to Tom on October 19, 2012, which addressed only two terms—rent and duration. Ray proposed a twenty-year lease with a minimum rent of $375,000 in 2015 that would increase to $500,000 by 2030.[207]

The October 19, 2012 draft was the last proposal exchanged between the parties.  Ray resent the October 19, 2012 proposal to Tom on December 20, 2013.[208] But the Hayses had not agreed between themselves on a counteroffer to the Nederlander proposal.  In October 2013, Tom sent Jeff a draft proposal to counter the October 19, 2012 proposal.[209]  This proposal had a minimum rent of $400,000 in 2014, increasing to $600,000 in 2023.[210]  Neither party pointed to any evidence that this proposal was sent to the Nederlanders.  On January 10, 2014, Tom sent Jeff

---

[205]     JX 104.

[206]     JX 88-4.

[207]     JX 104.

[208]     JX 181.

[209]     JX 173.

[210]     JX 173-2.

another suggested counterproposal with a minimum rent for 2014 of $420,000 that increased to $765,000 in 2022.[211] This proposal also was never sent to the Nederlanders.[212] Tom informed the Hayses in January 2014 that the Nederlanders "would be accepting of a 10 year agreement,"[213] but the plan to discuss the renewal at the January 28, 2014 board meeting ended in disaster.[214] All this evidence shows that the parties never finished their negotiations on duration or the minimum rental rate, which based on the testimony and negotiations of the parties, were essential terms. Because the parties never concluded their negotiations on all essential terms, they did not intend to be bound.[215]

Counterclaim Plaintiff argues that I should ignore the absence of an agreement on rent because Carole, allegedly, did not consider the rent amount an essential term due to her significant financial resources.[216] To support this contention, it points to

---

[211] JX 195.

[212] PTO ¶ 60.

[213] JX 190.

[214] See Section I.B.4.

[215] *Eagle Force*, 2018 WL 2351326, at *16.

[216] Counterclaim Plaintiffs argue that the parties agreed on the duration of the lease renewal because Tom told the Hayses in January 2014 that the Nederlanders "would be accepting of a 10 year agreement." JX 190. This statement by Tom does not amount to an agreement between the parties.

52

Carole's deposition where she testified about the executive session of the January 28, 2014 board meeting:

> That Greg Holland left – well, I recall that before then it just, it just was a continuation of badgering about the sponsorship, just no, just it being kind of sad. And I think at the end and an agreement not being reached, it being so hard, it all being so hard to come to an agreement about really insignificant amounts of money. And when – and I recall just feeling like more in the dog's house.[217]

This deposition testimony does not support Counterclaim Plaintiff's proposition that Carole viewed the rent amount to be an insignificant amount of money. This testimony does not even make it clear that Carole is talking about the lease amount rather than the sponsorship when she says "really insignificant amounts of money." Regardless, I am unware of any rule of Delaware law that states rent cannot be an essential term when the parties involved have significant personal wealth. Thus, under *Osborn* and *Eagle Force*, there is no enforceable contract.

---

[217] JX 382, at 200. Counterclaim Plaintiff also points to Carole's deposition testimony that she would have renewed the lease "in a heartbeat" if the Nederlanders had agreed to a new management agreement. *Id.* at 209. This does not mean she would have renewed the lease without a rental amount, but merely that she was willing to reduce the amount of rent in exchange for other consideration she considered valuable.

#### 4. Even if the parties agreed to an oral lease, Counterclaim Plaintiff has not shown that an exception to the Statue of Frauds applies

The Delaware Statute of Frauds states:

> No action shall be brought to charge any person upon any agreement made upon . . . any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, . . . unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing.[218]

Because a lease concerns an interest in land,[219] the statute of fraud applies, and in order to enforce a lease, there must be a writing signed by the party against whom the lease will be enforced. There is no writing, but Counterclaim Plaintiff argues that two exceptions to the statute of frauds apply: (1) part performance and (2) promissory estoppel.

##### a. Part Performance

"One well-rooted exception to the absolute command of the general statute of frauds . . . is the equitably-derived principle that a partly performed oral contract may be enforced by an order for specific performance upon proof by clear and

---

[218]    6 *Del. C.* § 2714(a).

[219]    *Hendry v. Hendry*, 2006 WL 4804019, at *7 (Del. Ch. May 30, 2006).

convincing evidence of actual part performance."[220] "[A] court of equity may decree specific performance of an oral land contract . . . when there is evidence of actual part performance of the oral contract."[221]

Despite Counterclaim Plaintiff's arguments about Robert fully performing by giving his permission, the contract subject to the statute of frauds is the lease, and any partial performance must be that of the lease. Counterclaim Plaintiff points to no evidence that the Company partially performed the lease, such as proof of partial payment or performance of any other duty under the lease. Thus, this exception to the statute of frauds does not apply.

### b. Promissory Estoppel

"Delaware courts have countenanced, at least in limited circumstances, the use of promissory estoppel to avoid application of the statute of frauds."[222] "The elements of promissory estoppel must be proved by clear and convincing evidence."[223] Delaware follows the Restatement Second of Contracts, which states that "the element of 'manifest injustice' is necessary when promissory estoppel is

---

[220] *Shepherd v. Mazzetti*, 545 A.2d 621, 623 (Del. 1988).

[221] *Id.*

[222] *Grunstein v. Silva*, 2009 WL 4698541, at *9 (Del. Ch. Dec. 8, 2009).

[223] *CBA Collection Servs., Ltd. v. Potter, Crosse & Leonard, P.A.*, 1996 WL 527214, at *6 (Del. Super. Aug. 14, 1996), *aff'd*, 687 A.2d 194 (Del. 1996).

used to circumvent the statute of frauds."[224]   In determining whether manifest injustice would result if the promise is not enforced, significant circumstances include:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
> (b) the definite and substantial character of the action or forbearance in relation to the remedy sought;
> (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
> (d) the reasonableness of the action or forbearance;
> (e) the extent to which the action or forbearance was foreseeable by the promisor.[225]

Each circumstance "relates either to the extent to which reliance furnishes a compelling substantive basis for relief in addition to the expectations created by the promise or to the extent to which the circumstances satisfy the evidentiary purpose of the [s]tatute [of frauds] and fulfill any cautionary, deterrent and channeling functions it may serve."[226]

The only reliance Counterclaim Plaintiff has shown by clear and convincing evidence is that the Curran was rebranded "SHN Curran Theatre" and the Company

---

[224]    *Id.* at *7.

[225]    Restatement (Second) of Contracts § 139 (1981).

[226]    *Id.* at cmt. b.

began booking shows at the Curran for after December 31, 2014.[227] The rebranding constituted sending out an email about the purchase, changing the logo of the Curran, and updating the sales and media kits.[228] The Company also booked *The Book of Mormon* and *Matilda* "as just part of the normal booking process" for the 2015 season.[229] This reliance is not "definite and substantial" enough to evidence a contract to lease the Curran to the Company for the life of the Company. Nor does it "corroborate evidence of the making and terms of the promise" to extend or renew the lease of the Curran as opposed to merely agreeing to assume the Lurie Lease. Thus, Counterclaim Plaintiff has not demonstrated the existence of injustice that would compel the Court to enforce Carole's purported promise to renew the lease of the Curran for the life of the Company at an undetermined price notwithstanding noncompliance with the statute of frauds.

### 5. Even if Carole made the Promise, Counterclaim Plaintiff is not entitled to more than its reliance damages under the theory of promissory estoppel

The third legal theory Counterclaim Plaintiff puts forward is an alternative theory of liability under the doctrine of promissory estoppel.[230] "In order to establish

---

[227]  Tr. 37 (Holland); Tr. 342 (C. Hays); JX 175.

[228]  Tr. 30-35 (Holland); JX 70; JX 175.

[229]  Tr. 36.

[230]  Counterclaim Plaintiff appears to argue that Carole made the purported promise to induce Robert's permission to purchase the Curran. This is essentially the same

57

a claim for promissory estoppel, a plaintiff must show" each of the elements "by

clear and convincing evidence."[231]  The four elements are:

> (i) a promise was made; (ii) it was the reasonable
> expectation of the promisor to induce action or
> forbearance on the part of the promisee; (iii) the promisee
> reasonably relied on the promise and took action to his
> detriment; and (iv) such promise is binding because
> injustice can be avoided only by enforcement of the
> promise.[232]

"[P]romissory estoppel is fundamentally a narrow doctrine, designed to

protect the legitimate expectations of parties rendered vulnerable by the very process

of attempting to form commercial relationships."[233]  Therefore, "although it is

permissible to award a party prevailing on a claim for promissory estoppel

expectation damages comparable to . . . the hoped-for contract . . ., the more routine

---

argument Counterclaim Plaintiff makes when arguing that an enforceable contract
was formed, which means it is arguing the Promise and the reliance would constitute
an exchange of consideration, and promissory estoppel would not be available.
*Frank Invs. Ranson, LLC v. Ranson Gateway, LLC*, 2016 WL 769996, at *11 n.99
(Del. Ch. Feb. 26, 2016) ("A promise supported by consideration cannot form the
basis for recovery on a theory of promissory estoppel.").  Of course, parties are
allowed to plead causes of action in the alterative, so I will assume that
Counterclaim Plaintiff is raising promissory estoppel as an alternative theory of
recovery in the event its argument about consideration fails.

[231]  *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000); *CBA Collection Servs., Ltd. v. Potter, Crosse & Leonard, P.A.*, 1996 WL 527214, at *6 (Del. Super. Ct. Aug. 14, 1996), *aff'd*, 687 A.2d 194 (Del. 1996).

[232]  *Lord*, 748 A.2d at 399.

[233]  *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006).

role of promissory estoppel should be to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive recompense for *that* harm."[234] Even with this careful application, "courts must be chary about invoking the doctrine lightly, lest the normal failure of parties to reach a binding contract be penalized by an imprecise judicial cost-shifting exercise."[235]

The only reliance Counterclaim Plaintiff has shown is the rebranding and booking of shows. The appropriate remedy in this context is to compensate Counterclaim Plaintiff for the harm actually suffered—the money spent in reliance on the purported Promise. Counterclaim Plaintiff does not convince me that this case is one in which the Court should award expectation damages comparable to the *hoped*-for contract.

Moreover, even if I assume that Carole made the purported Promise, and it is of the type objectively meant to induce reliance, Counterclaim Plaintiff has given me no information to craft an award based on reliance damages. It has submitted no evidence as to the costs associated with the rebranding or the booking or rebooking of *The Book of Mormon* and *Matilda*. Therefore, even if it met its burden to show

---

[234]    *Id.* (emphasis added).

[235]    *Id.*

each element of promissory estoppel by clear and convincing evidence, I have no way of fashioning a remedy that is not pure speculation or conjuncture.[236]

### 6. Even if Carole made a promise to negotiate the lease renewal in good faith, Counterclaim Plaintiff has not met its burden to show the Hayses failed to negotiate in good faith

Counterclaim Plaintiff argues, as a fourth and final alternative, that the Promise was an enforceable agreement to negotiate a lease renewal in good faith, but for the reasons that follow, Counterclaim Plaintiff fails to show that the Hayses failed to negotiate the lease renewal in good faith. "Under Delaware law, 'bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.'"[237] Counterclaim Plaintiff has not shown that the Hayses had the "state of mind affirmatively operating with furtive design or ill will."[238]

---

[236] See Section II.C.3.

[237] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (Del. 2013) (quoting *CNL–AB LLC v. E. Prop. Fund I SPE (MS REF) LLC*, 2011 WL 353529, at *9 (Del. Ch. Jan. 28, 2011)).

[238] *Id.* (quoting *CNL–AB LLC*, 2011 WL 353529, at *9).

The parties exchanged proposals over more than a year.[239] The main contention between the parties was the rent schedule: minimum rental amount and duration.[240] The evidence submitted by the parties shows that the Hayses were asking for rent that was higher than the Lurie Lease, but the Hayses proposal was still at or below market rent.[241] The Nederlanders were attempting to negotiate for rent that was significantly below market rate.[242] Seeking at or slightly below market rent for an asset does not amount to a failure to negotiate in good faith. Furthermore, Carole's testimony that she would have signed a new lease if the Nederlanders had agreed to give her control does not amount to a failure to negotiate in good faith in the circumstances. If the Nederlanders wanted a lease with rent that was significantly below market rate, then the Hayses were allowed to negotiate for something in exchange. Here, they were negotiating for more control of the Company. This does not amount to a failure to negotiate in good faith.

## B. Breach of Fiduciary Duties and Breach of Contract

Counterclaim Plaintiff has brought claims against the Hayses for breach of their common law fiduciary duties to the Company and their contractual duties under

---

[239] JX 88; JX 104; JX 181.

[240] JX 190.

[241] Tr. 727-28 (Hart); JX 489-8; JX 174-2.

[242] JX 489-8; JX 174-2.

the LLC Agreement. On the one hand, traditional fiduciary duties apply to managers. On the other hand, the provisions of the LLC Agreement extend to the individuals or entities that control CSH Theatres—i.e., the Hayses. Carole and Jeff acted as both managers of the Company and controllers of CSH Theatres at different points during the period of contested behavior. In these different capacities, they each owed different duties at different times. Ultimately, Counterclaim Plaintiff has not shown that the Hayses breached any duties they owed under the LLC Agreement, but it succeeded in showing that both of the Hayses breached their fiduciary duties as managers of the Company.

### 1. The LLC Agreement does not disclaim all common law fiduciary duties for managers

Managers of a Delaware LLC owe default fiduciary duties.[243] "Drafters of an LLC agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'"[244] Here, Counterclaim Defendants argue that the LLC Agreement disclaims all common law fiduciary duties. Counterclaim Defendants make this argument based on Section 7.04 of the LLC Agreement. Section 7.04 states, in relevant part, "Except as otherwise expressly provided herein, nothing contained in this Agreement shall cause any Member to be deemed or otherwise treated as an

---

[243] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 851 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012).

[244] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).

agent or legal representative of the other Members or to create any fiduciary relationship for any purpose whatsoever."[245] This language does not disclaim the common law duties owed by *managers*; instead, it clarifies that Members are not transformed into fiduciaries of one another by way of the LLC Agreement.

As for the managers of the Company, Section 7.04 does not expressly disclaim all fiduciary duties. Certain sections of the LLC Agreement do limit certain aspects of the traditional common law fiduciary duties owed by the managers as is discussed more fully in Sections II.B.3 and II.B.4 of this memorandum opinion. Except for those duties explicitly limited by the LLC Agreement, the managers of the Company still owe all common law fiduciary duties to the Company.

### 2. Contract claims versus fiduciary duty claims

The same individuals can act in different capacities in relation to the same entity. For example, the same person can be both a director and stockholder of a corporation. Likewise, a person can be both a manager and a member of an LLC. Under Delaware law, the capacity in which that person is acting when they take certain actions can determine whether those actions are in violation of certain duties.[246]

---

[245] JX 10-25.

[246] *See Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) (citing *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 440-44 (Del. 1996)) ("A controlling stockholder has the right to act in its own self-interest when it is acting

Here, the Hayses were managers of the Company, and any actions they took in their capacity as managers were subject to their common law fiduciary duties as limited by the LLC Agreement. The Hayses by virtue of their control of CSH Theatres are also part of the Shorenstein Entity, and any actions they took in their capacities as controllers of CSH Theatres or CSH Curran were subject to the LLC Agreement. To determine if any fiduciary or contractual duties were breached, I must consider what capacity the Hayses were acting in at the time.

### 3. Competition by the Hayses

Counterclaim Plaintiff contends that the LLC Agreement prohibits the Hayses from competing with the Company. In fact, the LLC Agreement expressly allows the Hayses to compete, both in their capacity as managers of the Company and in their capacity as Affiliates of CSH Theatres. The plain text of the LLC Agreement and the extrinsic evidence both support this interpretation.

### a. The text of the LLC Agreement

"Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members."[247] When interpreting a LLC

---

solely in its capacity as a stockholder. This right must yield, however, when a corporate decision implicates a controller's duty of loyalty.").

[247] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009).

agreement, "Delaware [courts] adhere[] to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[248] Contracts are interpreted as a whole, and each provision and term will be given effect as to not render any part "mere surplusage" or "meaningless or illusory."[249] If a contract is "clear and unambiguous," then the Court "will give effect to the plain-meaning of the contract's terms and provisions."[250]

Alternatively, "a contract is ambiguous . . . when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[251] If a contract is ambiguous, a "court may then look to extrinsic evidence to uphold to the extent possible, the reasonable shared

---

[248] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at \*5 (Del.Ch. Apr. 29, 2005)). Both parties put an inordinate emphasis on the witnesses' opinions about various legal questions. None of the witnesses are experts on Delaware law, and even if they were, questions of legal interpretation are reserved for the Court. Thus, I do not allocate weight to the legal opinions of fact witnesses.

[249] *Id.* at 1160 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at \*2 (Del. Mar. 8, 2010) and *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[250] *Id.* (citing *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[251] *Rhone-Poulenc*, 616 A.2d at 1196 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

expectations of the parties at the time of contracting."[252]  Importantly, however, "ascertaining the shared intent of the parties does not mandate slavish adherence to every principle of contract interpretation."[253]

> As this Court recently stated: "Contract principles that guide the Court—such as the tenet that all provisions of an agreement should be given meaning—do not necessarily drive the outcome.  Sometimes apparently conflicting provisions can be reconciled, but in order to prevail on a contract claim, a party is not always required to persuade the Court that its position is supported by every provision or collection of words in the agreement."[254]

"In giving effect to the parties' intentions, it is generally accepted that the parties' conduct before any controversy has arisen is given 'great weight.'"[255]

### i. The Hayses are bound by Section 7.02 because they are "Affiliates" of the Shorenstein Entity

The LLC Agreement discusses competition in Sections 7.02 and 7.06.  Under Section 7.02(a), "The Shorenstein Entity and the Nederlander Entity . . . agree to devote their efforts to maximize the economic success of the Company."[256]  The first

---

[252]  *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).

[253]  *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *16 (Del. Ch. Mar. 15, 2017), *aff'd*, 177 A.3d 610 (Del. 2017).

[254]  *Id.*  (quoting *Cyber Hldg. LLC v. CyberCore Hldg., Inc.*, 2016 WL 791069, at *7 (Del. Ch. Feb. 26, 2016)).

[255]  *Id.* (quoting *Ostroff v. Quality Servs. Labs., Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007)).

[256]  JX 10-24.

question then is what constitutes "the Shorenstein Entity." The LLC Agreement defines the "Shorenstein Entity" as CSH Theatres "together with any Permitted Transferees."[257] For the Shorenstein Entity,[258] a Permitted Transferee is "an Affiliate."[259] An Affiliate is "a Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person."[260] Under the LLC Agreement, a Person is "an individual or a corporation, all types of partnership, trust, unincorporated organization, association, limited liability company or other entity."[261] Control, Controls, or Controlled "means the possession, direct or indirect, of the power to direct or cause the direction of the management and polices of a Person, whether through the ownership of voting securities, through contract, or otherwise."[262]

Under these definitions in the LLC Agreement, the Hayses and any entities they control are Affiliates and part of the Shorenstein Entity and, therefore, are

---

[257] JX 10-5.

[258] "[I]n the case of a Nederlander Entity," Permitted Transferee means "a Nederlander Controlled Entity or any member of the Nederlander family." JX 10-8.

[259] *Id.*

[260] JX 10-6.

[261] JX 10-8.

[262] JX 10-7.

bound by Section 7.02(a).[263] Jeff, Carole, Wally, Gracie, and Tom are the members of the CSH Investment Committee, which manages the investments of Carole's trusts, including CJS Trust-A and CSH Doule Trust, in conjunction with the CSH Family Office. CSJ Trust-A owns CSH Theatres, which owns fifty percent of the Company. CSH Double Trust owns CSH Curran, which in turn owns the Curran. Thus, the Hayses are Permitted Transferees of CSH Theatres because, through a series of intermediaries, they ultimately control CSH Theatres. CSH Curran is a Permitted Transferee of CSH Theatres because, through a series of intermediaries, CSH Curran and CSH Theatres are under shared control. Because the Hayses and CSH Curran are Permitted Transferees of CSH Theaters, they are part of the Shorenstein Entity as defined in the LLC Agreement.

---

[263] Counterclaim Defendants admit they are Affiliates of the Shorenstein Entity. PTO 25 ("[T]he LLC Agreement expressly allows 'Affiliates' of CSH, such as CSH Curran, [Carole], and [Jeff], to compete with [the Company].").

The following flowchart illustrates the control structure of the Shorenstein-Hays entities.[264]



---

264 Since 2012, Carole's trusts have been directed trusts, which means the trustee has autonomy over direct disbursements and little else. Tr. 683 (Hart). The CSH Family Office and the CSH Investment Committee manage the trusts' investments. *Id.*

## ii. The Hayses are allowed to compete under the LLC Agreement except in the limited circumstances described in Section 7.02(b)

While Section 7.02(a) requires the "Shorenstein Entity" to "devote their efforts to maximize the economic success of the Company and avoid any conflicts of interest between the Members,"[265] Section 7.06 contains an exception to this broad provision:

> Subject to the other provisions of this ARTICLE VII, including Section 7.02, **any Member, any Affiliate of any Member or any officer or director of the Company** shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, and may engage in the ownership, operation and management of businesses and activities, for its own account and for the account of others, and may (independently or with others, whether presently existing or hereafter created) own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities. Neither the Company nor any Member shall have any rights in or to any independent ventures of any Member or the income or profits derived therefrom.[266]

---

[265] JX 10-24.

[266] JX 10-25 (emphasis added).

70

This exception is itself limited by Section 7.02(b), which disallows either the Nederlander or Shorenstein Entities from staging "any Production that it controls (as defined in Section 7.03) within 100 miles of San Francisco" unless that production had played at one of the Company's theaters, the other Member's representative had turned down the play, or "the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members."[267] Section 7.03 defines "control over production" as: "the Person having the ability to determine where the Production plays and the terms and conditions of said engagement."[268] This plain language of the contract, when read through the lens of *generalia specialibus non derogant*, creates a detailed scheme governing competition.[269] "[A]ny Member, any Affiliate of any Member or any officer or director of the Company" is allowed to compete with the Company, except that they

---

[267]   *Id.*

[268]   *Id.*

[269]   At first glance Section 7.02 and Section 7.06 may appear irreconcilable, but maxims of interpretation allow the two to be harmonized. Delaware recognizes the maxim of interpretation *generalia specialibus non derogant*—in the case of any conflict, the specific will control the general. *See Allen v. State*, 970 A.2d 203, 223 (Del. 2009). As the late Justice Scalia explained, this can be thought of as reading the specific as an exception to the general, which allows a harmonizing of otherwise conflicting provisions. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183-88 (2012). Following this maxim allows the Court to harmonize the seemingly conflicting provisions Section 7.02 and Section 7.06 of the LLC Agreement.

71

cannot stage a production within 100 miles of San Francisco if they have "the ability to determine where the [p]roduction plays and the terms and conditions of said engagement."[270]

Because Section 7.06 explicitly addresses both Affiliates, officers, and directors, it does not matter what capacity the Hayses are acting in when they compete. Therefore, when considering the Hayses competition, there is no need to distinguish between the times when they were acting as managers and when they were acting as part of the Shorenstein Entity. Regardless of which of their various capacities the Hayses were operating in, competition was allowed, with the limited 100-mile exception.

Yet, it appears Carole still managed to violate this broad allowance. In 2014, after Carole had resigned as director and co-president of the Company, she entered into an investment agreement with the production *Fun Home* on behalf of her entity CSH Productions, LLC.[271] As part of that agreement, *Fun Home* agreed that if the production went on tour it would not perform at any other Bay Area theater but the Curran as it was understood "that an important inducement for [Carole's] significant investment in the Broadway Production is to obtain the first right to present the first

---

[270] *Id.*

[271] JX 290 (signing in her capacity as Manager of CSH Productions, LLC).

commercial production of the Play in the Bay Area, preferably to launch the national tour."[272] This concession constitutes control over the production as defined in Section 7.03 because it allows Carole "the ability to determine where the Production plays and the terms and conditions of said engagement."[273] *Fun Home* played at the Curran in 2017.[274] This means Carole staged a production that she controlled within 100 miles of San Francisco.

Of course, Section 7.02(b) has its own exception to the 100-mile rule. Section 7.02(b) is not violated if "(i) such Production has first played in one of the [Company's] Theatres; or (ii) such Production has been rejected for bookings at one of the [Company's] Theatres by the other Member's representative on the Board of Directors; or (iii) the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members."[275] *Fun Home* did not play at either of the Company's theaters,[276] but the post-trial briefs do not point to any evidence regarding whether the Nederlanders rejected *Fun Home* for the Company or if the Company shared in the profits and losses of *Fun Home*.

---

[272] JX 290-4.

[273] JX 10-25.

[274] PTO ¶ 70.

[275] JX 10-25.

[276] Tr. 241 (Holland).

73

Counterclaim Plaintiff has the burden to prove its case by a preponderance of the evidence.[277] Even if there is evidence in the record that shows Carole did not adhere to Section 7.02(b), Counterclaim Plaintiff has not offered any evidence regarding its damages relating to *Fun Home* and, thus, has not satisfied the final element for its breach of contract claim.[278]

Counterclaim Defendants argue that the above interpretation of the LLC Agreement is "absurd" based on the definition of "Members" in the LLC Agreement. Members is defined as "the Shorenstein Entity and the Nederlander Entity and any additional Person who is admitted to the Company as a Member in accordance with this Agreement and is listed from time to time on the books and records of the Company."[279] Counterclaim Defendants argue that this definition requires "Shorenstein Entity" and "CSH Theatres" to be synonyms and "Nederlander Entity" and "NSF Associates" to be synonyms. If not, Counterclaim Defendants argue, provisions of the LLC Agreement that use the term "Members," like those concerning distributions, would be absurd. This may well be the case. But if I adopt Counterclaim Defendants' interpretation, then all of the above definitions in the LLC Agreement become mere surplusage. The drafters of the LLC Agreement used

---

[277] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013).

[278] See Section II.C.3.

[279] JX 10-7.

"Members" in certain provisions, and "the Shorenstein Entity and the Nederlander Entity" in other provisions, which suggests the terms mean different things. Section 7.02 refers expressly to "the Shorenstein Entity" and "the Nederlander Entity." Section 7.06 refers expressly to "Affiliates of any Member." It therefore is unnecessary for me to determine the actual meaning of the term Member under the contract.[280] Nonetheless, at most, Counterclaim Defendants have raised an ambiguity in the contract that allows me to look at extrinsic evidence, and the extrinsic evidence supports Counterclaim Plaintiff's interpretation of Section 7.02.

### b. Extrinsic evidence

"In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[281] The parties introduced evidence related to prior agreements and course of dealing between the parties. Both support Counterclaim Plaintiff's interpretation of Section 7.02(b).

---

[280] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("[A] contract is ambiguous only when the provisions *in controversy* are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."); *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *16 (Del. Ch. Mar. 15, 2017) ("[I]n order to prevail on a contract claim, a party is not always required to persuade the Court that its position is supported by every provision or collection of words in the agreement."), *aff'd*, 177 A.3d 610 (Del. 2017).

[281] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).

75

The LLC Agreement had at least two predecessor agreements. Walter and Jimmy memorialized the first agreement in letters in 1978.[282] Walter and Harry entered into the second agreement in 1992 (the "1992 Agreement"), as part of a settlement of litigation arising from the Partnership.[283] Walter initiated that litigation alleging that Jimmy was competing with the Partnership in the areas surrounding San Francisco.[284] Section 4 of the 1992 Agreement is the predecessor to Section 7.02 of the LLC Agreement. It reads:

> Both partners will devote their efforts to maximize the economic success of the Partnership and avoid conflicts of interest. Neither party will stage any production within 100 miles of San Francisco unless (i) it has first played in a Partnership theatre, or (ii) it has been rejected for booking by the other party, or (iii) the Partnership share in the profits and/or losses of such booking pursuant to agreement.[285]

According to Robert, this was the "most important thing in the settlement between [Walter] and [Jimmy]."[286] Carole testified that she insisted "that a [non-compete] clause be put in the operating agreement [in 2000] to prevent competition by the

---

[282] JX 493; JX 494.

[283] JX 261; Tr. 831-32 (R. Nederlander).

[284] JX 495, at 12-13.

[285] JX 361-2.

[286] Tr. 834 (R. Nederlander).

Nederlanders" because she was "very concerned about" competition by the Nederlander family.[287]

Section 7.02 of the LLC Agreement is substantially similar to Section 4, except that "Shorenstein Entity and Nederlander Entity" replaced "partners," and instead of a prohibition on any production within 100 miles, there is only a prohibition on *controlled* productions within 100 miles. Section 7.02(b) seems to strike a balance by applying to more people,[288] but in a more limited way. The only way Walter and Carole's fears of competition by the Nederlanders are assuaged is if Nederlander Entity means more than just NSF Associates, which is consistent with the definition in the LLC Agreement. Nederlander Entity is defined as NSF Associates together with any Permitted Transferees,[289] and the Permitted Transferees of NSF Associates are any "Nederlander Controlled Entity or any member of the Nederlander Family."[290] After the 1992 Agreement, Jimmy was no longer affiliated with NSF Associates or the Company.[291] Thus, if the 1992

---

[287]  Tr. 263 (C. Hays).

[288]  Because "partner" is not defined in the 1992 Agreement it is unclear whether Section 7.02 actually applies to more people or if the families or "Affiliates" were also bound in 1992.

[289]  JX 10-5.

[290]  JX 10-8.

[291]  Tr. 451 (C. Hays); Tr. 831, 892 (R. Nederlander).

Agreement or the LLC Agreement only applied to NSF Associates, and not to its Permitted Transferees too, it would do nothing to limit competition from Jimmy— "the most important thing" the agreement was meant to do. Thus, the history of the agreements between the parties, most importantly the history of competition from the Nederlander family, supports Counterclaim Plaintiff's interpretation of Section 7.02.

The course of conduct between the parties also is illustrative. Greg testified that the Nederlander Affiliate who runs Broadway San Jose made offers to the Company to participate in some, but not all, individual shows.[292] Other Nederlander Affiliates who controlled theaters in San Francisco did the same.[293] This supports Counterclaim Plaintiff's interpretation of the LLC Agreement and is consistent with the obligation in Section 7.02(b) that only controlled shows, not all shows, must be offered to the Company. Both the plain meaning of the text and the extrinsic evidence support the conclusion that the Hayses are Affiliates of CSH Theatres, and as such, they are permitted to compete with the Company as long as they adhere to the requirements of Section 7.02(b), which is binding on them as part of the Shorenstein Entity.

---

[292]     Tr. 131 (Holland).

[293]     Tr. 125 (Holland).

78

### 4. Breach of the duty of loyalty by Carole and Jeff

Both Carole and Jeff breached their fiduciary duty of loyalty while acting in their capacity as managers. "[T]he traditional duties of loyalty and care . . . are owed by managers of Delaware LLCs to their investors in the absence of a contractual provision waiving or modifying those duties."[294] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[295] "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."[296] Nor can fiduciaries "intentionally act[] with a purpose other than that of advancing the best interests of the corporation."[297] Finally, "a fiduciary may not play 'hardball' with those to whom he owes fiduciary duties."[298]

---

[294] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 843 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012). Delaware courts "look to the corporation law when assessing the extent to which a managing member owes common law fiduciary duties when those duties are not clearly defined in the entity's operating agreement." *A&J Capital, Inc. v. Law Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018).

[295] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)).

[296] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[297] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[298] *Auriga Capital*, 40 A.3d at 870.

Carole breached her fiduciary duties when, while she was a director and co-president of the Company, she both placed her own interests above those of the Company and played "hardball" with the Company. She did this in a few ways. First, at a board meeting in an executive session, she threatened her fellow board members with refusing to approve the subscription series, a major generator of income for the Company, unless Robert agreed to modify the LLC Agreement to give her more control.[299] Second, she used her fiduciary position to prevent the Company from pursuing shows she wanted for her competing business.[300] Third, she instructed the CEO of the Company not to communicate with her co-president and other board members about Company business.[301] In fact, the CEO was so concerned by her actions that he hired a lawyer, spending thousands of dollars of his own money, to advise him.[302] These actions all violated her duty of loyalty to the Company.

Jeff breached his fiduciary duties when, while he was a director of the Company, he shared confidential information with a direct competitor of the

[299]    Tr. 379 (Carole); JX 127; JX 130; JX 131.

[300]    JX 247.

[301]    Tr. 48 (Holland).

[302]    Tr. 49 (Holland).

Company[303] and attempted to secure confidential company information to hire away employees of the Company.[304] These actions were not in the best interest of the Company; instead the Hayses took these actions, while acting in their capacities as fiduciaries of the Company, to advance their own interest at the expense of the Company.

Counterclaim Plaintiff also contends that the Hayses used confidential information they received in their capacity as fiduciaries to compete with the Company by poaching shows that the Company was interested in booking. While, if true, this likely would constitute a breach of the duty of loyalty, the evidence does not support that the Hayses actually used confidential information to compete. At trial, Counterclaim Plaintiff presented a list of shows allegedly discussed at the Company while Carole and Jeff were managers. But Greg credibly testified that everyone "involved in the industry [is] working generally from exactly the same pool of Broadway titles."[305] Moreover, only two of the shows, *Fun Home* and *Wolf Hall*, played at the Curran, and the evidence about whether those two shows were discussed while Carole and Jeff were managers is tangential at best. The evidence

---

[303]    JX 274.

[304]    *Id.* ("note… I will ask [Greg] for a memo on his discussion with staff, so that we can determine when/if CSH might offer positions to key employees (i.e. House Manager, House Engineer, etc.) [of the Curran]"); Tr. 671 (J. Hays).

[305]    Tr. 142-43 (Holland).

81

that *Fun Home* was discussed is (1) an email from Greg to Carole in October 2013 that reads, in its entirety, "I attended FUN HOME last night. Amazing!,"[306] and (2) an email from someone affiliated with *Fun Home* informing Greg that Carole, after she had left the Company, was a producing partner on the show.[307] In relation to *Wolf Hall*, the evidence that Carole was attempting to secure the show for the Curran, an email from October 8, 2014,[308] predates the evidence that the show was discussed by the Company, a CEO report sent from Greg to Jeff on October 11, 2014.[309]

Even assuming that Jeff or Carole received proprietary information about the rest of the shows discussed at trial while they were on the board of the Company, the only evidence that they used that information to compete is unconvincing. The evidence is: (1) emails between the Hayses or between the Hayses and staff where various shows are discussed in passing;[310] (2) internal emails between Carole, Jeff, and CSH Curran staff where they discuss the feasibility of having the shows play at the Curran;[311] or (3) letters from Robert, Ray, or Greg accusing the Hayses of

---

[306]    JX 175.

[307]    JX 296.

[308]    JX 315-4.

[309]    JX 309.

[310]    *E.g.*, JX 222-4; JX 242-2; JX 331.

[311]    *E.g.*, JX 238-3; JX 254; JX 348; JX 357.

poaching shows based on accounts from third parties who did not testify at trial.[312]

Thus, Counterclaim Plaintiff has not met its burden to show the Hayses poached or

attempted to poach shows using confidential information.

### C. Damages & Remedies

Counterclaim Plaintiff seeks the following remedies: (1) a declaration that the

Hayses breached fiduciary and contractual obligations; (2) an injunction preventing

"ongoing improper competition" and preventing the Hayses from "obtaining or

disclosing SHN business information;"[313] (3) disgorgement of corporate

distributions, mitigation costs, and specific performance of Carole's promise or an

award of compensatory damages, all related to the purported promise or lease of the

Curran.

#### 1. Declaratory Relief

Counterclaim Plaintiff is entitled to declaratory relief under 10 *Del. C.* § 6501.

As discussed above, Carole and Jeff each breached their fiduciary duties to the

Company while serving as managers.[314] Also as discussed above, the Hayses are

Affiliates of CSH Theatres and bound by the LLC Agreement as part of the

---

[312]    *E.g.*, JX 313.

[313]    Countercl. Pl.'s Opening Br. 71.

[314]    See Section II.B.4.

Shorenstein Entity.[315] Thus, I grant the requested declaratory judgment as to these two points.

## 2. Injunctive Relief

Counterclaim Plaintiff is entitled to some but not all of its requested injunctive relief. "To demonstrate entitlement to a permanent injunction, a plaintiff must satisfy three elements; a plaintiff must show (1) actual success on the merits of the claims; (2) that irreparable harm will be suffered if injunctive relief is not granted; and (3) that the equities support the relief requested."[316] Counterclaim Plaintiff seeks an injunction "barring the Hays Group from [(1)] ongoing improper competition with SHN and [(2)] from obtaining or disclosing confidential SHN business information."[317] As for the first permanent injunction, Counterclaim Plaintiff has not shown success on the merits because, as discussed at length above, Counterclaim Plaintiff has not shown that the Hayses are improperly competing.[318]

As for the second permanent injunction, Counterclaim Plaintiff has shown that the Hayses should be enjoined from using confidential SHN business information to

---

[315] Section II.B.3.

[316] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 2013 WL 6713229, at *7 (Del. Ch. Dec. 20, 2013), *aff'd*, 105 A.3d 369 (Del. 2014).

[317] Countercl. Pl.'s Opening Br. 71.

[318] See Section II.B.3.

compete with the Company.[319] Counterclaim Plaintiff has shown that Jeff disclosed confidential business information to a competitor while still on the board. Disclosing confidential business information to a direct competitor will irreparably harm the Company, and the balance of the equities weighs in favor of preventing fiduciaries from using confidential information to compete. To the extent that Carole or Jeff are still in possession of confidential information gained while they were serving as fiduciaries, they are enjoined from using that information to compete with the Company. To the extent either Carole or Jeff becomes a fiduciary again in the future, each is enjoined from using confidential information gained in his or her capacity as a fiduciary to compete with the Company.

### 3. Monetary Damages[320]

"Under Delaware law, plaintiffs must prove their damages with a reasonable degree of precision and cannot recover damages that are 'merely speculative or

---

[319] Counterclaim Plaintiff does not argue that the Hayses breached the confidentiality provisions of Section 7.09 of the LLC Agreement. Instead, Counterclaim Plaintiff argues that the Hayses' actions caused CSH Theatres to breach its contractual duties of the LLC Agreement. Countercl. Pl.'s Opening Br. 56-58. Counterclaim Plaintiff only points to actions the Hayses took in the capacity as fiduciaries of the Company and has not offered any explanation for how this behavior would be imputed to CSH Theatres.

[320] I do not address Counterclaim Plaintiff's request for disgorgement of corporate distributions, mitigation costs, and specific performance of the Promise or oral lease renewal because I find that no contract or lease renewal exists.

conjectural.'"[321] Counterclaim Plaintiff represented to the Court that it has "never alleged specific causes of action for 'poaching,' breaches of confidentiality, or [Carole's] improper threats. Instead, [Counterclaim Plaintiff] established this conduct as part of the Hayses' larger scheme to take control of SHN and, failing that, to sabotage the Company, renege on [Carole's] lease promise, and improperly compete against SHN."[322] Counterclaim Plaintiff is allowed to make this strategic choice to present one unified remedy theory. This choice, however, now prevents me from awarding damages for the parts of its case that it was able to prove as it has given me no way to separate the actual harm to the Company from the consequences of allowed behavior by the Hayses. Counterclaim Plaintiff alleges breaches of both contractual and fiduciary duties, and this strategic choice has different consequences for each.

Counterclaim Plaintiff has not proven its contractual damages by a preponderance of the evidence, and thus, it has failed to prove its breach of contract claim. "To prove a breach of contract, a plaintiff must show: 'the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages

---

[321]    *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (quoting *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964)).

[322]    Countercl. Pl.'s Reply Br. 40-41.

to the plaintiff.'"[323]  At the post-trial stage, "a claimant asserting a breach of contract must prove the elements of its claim by a preponderance of the evidence."[324]  This includes "proof of actual damages that flow from the breach."[325]

A plaintiff alleging a breach of fiduciary duty most prove the following elements by a preponderance of evidence: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty.[326]  Delaware liberally calculates damages resulting from a breach of the fiduciary duty of loyalty,[327] and "mathematical certainty" is not required.[328]  But even this liberal calculation must be based on more than "speculation" or "conjecture."[329]  This Court "cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the

---

[323]  *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *5 (Del. Ch. Sept. 30, 2009) (quoting *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *2 (Del. Ch. Dec. 7, 2007)), *aff'd*, 7 A.3d 486 (Del. 2010).

[324]  *Id.* (quoting *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009)).

[325]  *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1142 n.31 (Del. 2015) (quoting Modern Law of Contracts § 14:6 (2015)).

[326]  *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002) (citing *York Lingings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999)), *aff'd*, 806 A.2d 164 (Del. 2002).

[327]  *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996).

[328]  *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

[329]  *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005).

evidence lacking. Equity is not a license to make stuff up."[330] If a plaintiff seeks more than nominal damages, proof must replace "hypothetical estimates."[331]

Counterclaim Plaintiff offers the expert report and testimony of Dr. Hekman as the only evidence of its monetary damages. The report and testimony, however, are limited to evidence about loss of earnings from the termination of the Curran lease, loss of earnings from the Hayses' failure to renew the Curran lease, and loss of earnings from the Hayses' ongoing competition.[332] Counterclaim Plaintiff has not provided the Court with *any* information about the harm caused to the Company by (1) the Company's reliance on the purported promise to lease the Curran to the Company—e.g., the rebranding of the Curran and the booking of shows into the Curran after December 31, 2014; (2) the Hayses attempting to steal shows from the Company; (3) the Hayses presenting shows that violate Section 7.02(b);[333]

---

[330] *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 WL 1410860, at *2 (Del. Ch. Mar. 21, 2018), as revised (Mar. 22, 2018). This is a materially different situation than when the Court has some basis in the record to calculate damages, even if the damages are uncertain. *See Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 875 (Del. Ch.) ("[A]mbiguities are construed against the self-conflicted fiduciary who created them."), *aff'd*, 59 A.3d 1206 (Del. 2012).

[331] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997) (quoting *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 321 (Del. 1993)).

[332] JX 429.

[333] The Hayses may have presented either *Fun Home* or *Eclipsed* in violation of Section 7.02(b). Dr. Heckman does not address "the exact measure of the operating income resulting from these shows . . . because (1) the Hayses refused to produce documents related to the terms of Eclipsed and Fun Home and (2) these two production have

88

(4) Carole's threats and actions that violated her fiduciary duties while she was a manager of the Company; or (5) Jeff's disclosure of confidential information to Carole while he was a manager of the Company. Any attempt by the Court to determine the harm caused by these actions would be entirely speculative conjecture, and thus, I award only nominal damages for the breaches of fiduciary duty.

## D. Attorneys' Fees as Sanctions

Both Counterclaim Defendants and Counterclaim Plaintiff have requested attorneys' fees incurred during this litigation. Under the so-called "American Rule," "each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[334] Under my equitable powers, however, I may shift attorneys' fees and costs in certain limited circumstances,[335] including (1) if there is express statutory authorization or a contractual fee shifting provision;[336] (2) "the

---

not yet played at the Curran." JX 429-20. The documents were subject to a motion to compel at the time Dr. Hekman wrote his report, and he "reserve[d] the right to revisit and/or amend [his] opinion pending the outcome of the motion to compel." JX 429-20 n.36. The Court ordered the documents produced on November 7, 2016, less than a month after Dr. Hekman submitted his report, but no supplemental report was ever filed to include the deal information.

[334] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[335] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013).

[336] *Id.* (quoting *Barrows v. Bowen*, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994)).

presence of a 'common fund created for the benefit of others;'"[337] (3) "where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and"[338] (4) "cases in which, although a defendant did not misuse the 'litigation process in any way, ... the action giving rise to the suit involved bad faith, fraud, "conduct that was totally unjustified, or the like" and attorney's fees are considered an appropriate part of damages.'"[339]  I may also "award fees in the limited 'circumstances of an individual case [that] mandate that the court, in its discretion, assess counsel fees 'where equity requires.'"[340]  "To justify an award under the bad faith exception, 'the Court must conclude that the party against whom the fee award is sought has acted in subjective bad faith.'"[341]

Here, there is no statutory authorization, contractual fee shifting, or common fund created for the benefit of others.  Nor do I find that Counterclaim Plaintiff brought this case in bad faith or that the underlying actions involved bad faith, fraud,

---

[337]    *Id.* at 687 (quoting *Barrows*, 1994 WL 514868, at *1).

[338]    *Id.* (quoting *Barrows*, 1994 WL 514868, at *1).

[339]    *Id.* (quoting *Barrows*, 1994 WL 514868, at *1).

[340]    *Id.* (quoting *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del.1994)).

[341]    *K&G Concord, LLC v. Charcap*, 2018 WL 3199214, at *1 (Del. Ch. June 28, 2018) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *6 (Del. Ch. June 27, 2011)).

totally unjustified conduct, "or the like." [342]  I do find, however, that Carole's

behavior during her deposition, where she willfully gave nonsensical and

nonresponsive answers, constitutes bad faith litigation tactics.

I have included a selection of Carole's testimony deposition to illustrate this

finding.

> Q. Have you ever been deposed before?
> A. Yes.
> Q. How many times?
> A. Once.
> Q. When?
> A. I believe it was a while ago.
> Q. What was the matter about?
> A. It was a difference of opinions.
> Q. I'm sorry, go ahead. Were you done with your answer?
> A. Yes.
> Q. A difference of opinion about what?
> A. How best to proceed in one's lives.
> Q. Was it involving a lawsuit?
> A. Oh, definitely. [343]
>
> Q. Did you ever meet with your counsel in advance of this
> deposition?
> A. Oh, absolutely.
> Q. How much time did you spend with your counsel to
> prepare for the deposition?
> A. Sufficient.
> Q. How much is sufficient?
> A. The appropriate amount needed.
> Q. Can you give me an estimate of the amount of time?
> A. It was completely enjoyable.

---

[342]   *Scion Breckenridge*, 68 A.3d at 687 (quoting *Barrows*, 1994 WL 514868, at *1).

[343]   JX 382, at 6-7.

91

Q. How many times did you meet with your counsel to prepare for the deposition?

A. Preparation is always a good thing.

Q. That wasn't my question. How many times did you meet with your counsel to prepare for the deposition?

A. I met with them – I'm not understanding the question.

Q. You told me you met with your counsel to prepare for the deposition.

A. Sure.

Q. How many times?

A. Well, see, I think of time as a continuum. So I think I met with them from the beginning to the end. And the beginning was the start, and then there was the rehearsal, and then there was the preview, and now it's what I think of as the performance. So, in my mind, I'm answering what you're asking. If you could be more specific. Do you want hours?

Q. Yes.

A. Oh, I don't wear a watch. So I know the sun coming up in the morning and the moon coming up at night.

Q. Can you tell me the number of times that you met with your counsel to prepare for the deposition? I'm looking for a number.

A. Well, I gave you that.

Q. What was the number?

A. The number was the beginning to the end.

Q. How many times?

A. You know, I think – I don't recall.[344]

Q. Did you go to college?

A. Well, yes.

Q. Where?

A. I mean tuition was paid.

Q. Where did you go?

A. Oh, I had books from a lot of different places.

Q. Did you enroll at any of those places?

A. Oh, sure.

Q. Where did you enroll?

---

[344]     *Id.* at 11-13.

A. Many, many universities – not that many – a few.

Q. So you enrolled in a few universities?

A. Throughout my years, sure.

Q. Which universities?

A. Well, one was here, NYU.

Q. Any others?

A. Stanford. I don't recall.

Q. Did you graduate from NYU?

A. No.

Q. Did you –

A. Well, maybe. It's unclear.

Q. You're not sure?

A. You mean do I have a diploma? No. Did I receive enough credits to graduate, is that your question?

Q. That's a question, that's fine.

A. Is that your question?

Q. Sure.

A. You know, it's been said that I have –

Q. It's been said that you have what? That you have graduated?

A. It's been said that.

Q. Do you have a degree from NYU?

A. Do I have something like a piece of parchment?

Q. No. Did you finish the requirements –

A. Did I receive –

Q. If you could wait until I finish my question.

A. Sorry.

Q. Did you complete the coursework and earn enough degrees to earn a degree? I don't care if you have a piece of paper on your wall. I want to know, did you earn a degree?

A. I don't recall.

Q. You don't recall whether you have a degree from NYU?

A. Correct.[345]

Q. When did you attend NYU?

---

[345]    *Id.* at 15-18.

A. Oh, goodness. You see, definitely, definitely in my youth.

Q. Can you be more specific?

A. No.

Q. For how many years did you attend NYU?

A. Again, time is a compendium. So I was there a while.

Q. Can you be more specific?

A. No.[346]

Q. Since you completed your studies at NYU, have you had employment anywhere?

A. How do you define "employment"?

Q. You've never used the word employment in your life?

A. I'm just wondering how you define

Q. Have you used the word employment in your life, ever?

A. I'm asking you.

Q. You don't get to ask the questions. I get to ask the questions.

A. Oh, sorry.

Q. Have you ever used the word employment in your life?

A. I've used many words.

Q. Have you used the word employment in your life?

A. It's a word I'm familiar with.

Q. What is your understanding of the word employment?

A. Well, I think it has to do with – I'm not sure.

Q. You're not sure what the word employment means?

A. Yeah.

Q. Have you ever worked for any kind of company or somebody who might be referred to as an employer?

A. Possibly.

Q. You're not sure?

A. I would say sure.

Q. Who have you worked for? And if you could give this to me in chronological order.

A. Oh, that's – I could give it to you as best I could.

Q. Sure.

---

[346] *Id.* at 18-19.

A. Okay. So I've worked – just in terms of work or in terms of remuneration?

Q. Work.

A. So you – well, I've worked on political campaigns.

Q. And you consider those political campaigns to be your employer?

A. Well, I – I considered it to be work. That to me was the question posed to me.

Q. Let's see if we can state again.

A. Okay.

Q. I'm looking for your employment history. This isn't a trick question. Are you able to give me your employment history?

A. I don't know.[347]

Q. Have you ever worked at SHN?

A. I have a deep association with it, yes.

Q. When you say "a deep association," have you ever worked at SHN?

A. That's my answer.

Q. Yes or no, have you worked at SHN? I don't understand your answer.

A. I answered the question.

Q. I don't understand your answer. Can you please answer it again?

A. I'm comfortable with my answer.

Q. Okay. So you're unwilling to tell me whether you've ever worked at SHN?

A. My answer reflects the question posed to me.

Q. I don't even know what that means. My question is, have you ever worked at SHN, yes or no?

A. I find my answer to be most inclusive.

Q. I don't understand that.

A. And embracing.[348]

---

[347]    *Id.* at 18-21.

[348]    *Id.* at 21-22.

Q. Have you ever been arrested?
A. I don't recall.
Q. You might have been arrested and you just don't remember?
A. I've led a long life, very colored.
Q. Sitting here today, can you tell me whether any of that color involved being arrested?
A. I don't recall.[349]

Q. Do you know what SHN is?
A. They're letters in the alphabet.
Q. Do you know of a company that goes by SHN?
A. I certainly have a deep, deep association with it.
Q. What is SHN, beyond letters in the alphabet? I'm referring to the company.
A. It's a company – it's a company.
Q. Is it in the theatre business?
A. It's a company that has people associated with it.
Q. Is it in the theatre business?
A. How do you define "theatre"?
Q. I just want to make clear, I'm asking you if SHN is in the theatre business, and you can't answer that question without further explanation?
A. Can you ask the question again?
Q. Sure. Is SHN in the theatre business?
A. There's many different types of theatres. Are we today in the theatre business? This is perhaps a piece of theatre that's being recorded. So I think, again, I need more context.[350]

Q. When was SHN founded?
A. At the beginning.
Q. In what year?
A. The year it was founded.
Q. Can you give me a year?

---

[349]    *Id.* at 23.

[350]    *Id.* at 23-24.

A. No.[351]

Q. Who founded it?
A. I was there.
Q. What do you mean when you say you were there?
A. I was there at the very beginning when it was – at the very day one.
Q. Does that make you a founder?
A. Does giving birth to a child make you a mother?
Q. Yes, but that wasn't my question. My question was, the fact that you were there, does that make you a founder?
A. I believe it's semantics.
Q. Yeah, well, we're here today about semantics and words matter.
A. Sure.
Q. So my question is, was your father a founder of SHN?
A. My – I am the daughter of my father.
Q. By definition, you are the daughter of your father. My question was, is your father a founder of SHN?
A. My father and my mother raised me in an environment to have a great love and appreciation of the arts and introduced me to many, many people.
Q. My question was, is your father a founder of SHN?
A. That wasn't close, that wasn't close, the answer?
Q. No.
A. No?
Q. No.
A. Tell me again, was my father –
Q. Was your father, Walter Shorenstein, a founder of SHN?
A. He certainly cleared a path for me, and I can't – I don't know what that word means.
Q You don't know what the word founder means?
A. No. [352]

---

[351] *Id.* at 24-25.

[352] *Id.* at 25-27.

Q. No, my question is specific to this meeting. Did you say during this meeting that you were underappreciated?

A. Well, I think when you ask for a thank you and you don't get a thank you – so under-appreciated is so –

Q. Mrs. Hays, my question isn't about what the word means. My question is, at this meeting, did you –

A. You're getting yourself agitated.

Q. Did you say the words – and please stop commenting on me – did you say the words I'm unappreciated or underappreciated? That's my question. Did you say I'm unappreciated, I'm not getting enough appreciation? Did you say something like that?

A. You're smiling, so I'll answer it. Sure, I did.[353]

Q. Then you write: "Feeling duped by the Stuart Thompsons." Who is Stuart Thompson?

A. A person who works in the business.

Q. What does he do?

A. He's a general manager and producer.

Q. Of what shows?

A. Many shows.

Q. Can you give me his most successful shows?

A. No.

Q. Can you give me any of the shows?

A. I don't recall.

Q. You don't recall any shows that Mr. Thompson has produced? Is that a no? You were shaking your head.

A. I don't recall.

Q. Okay. Had you been duped by Stuart Thompson?

A. I don't recall.

Q. It refers to Oskars, O-S-K-A-R-S. What is that a reference to?

A. I don't recall.

Q. And feeling I was just a slob with Felix. Who is Felix?

A. I don't recall.

Q. You understand you're under oath, right?

A. I recall.

---

[353] *Id.* at 157-58.

Q. You recall that you're under oath?

A. I recall.

Q. And you're going to tell me you don't know – you can't tell me a single show that Stuart Thompson has produced?

A. Something. I'm sure would be in the deep recesses of my mind. Should we sit and tell – would that be a value to why we're here? Would you like me to do that? Because I can.[354]

Q. Why did you write "Yipppppe de da"?

A. I like using that word.

Q. What meaning were you trying to convey?

A. Yippppe de da, doo da, you know, a jazz term.

Q. And what does that mean when it's used in an e-mail like this?

A. Different beats along the way.

Q. That's what you meant to convey –

A. Trumpets, yeah.

Q. You meant to convey to your husband trumpets?

A. Sure.

Q. And what was the significance of trumpets?

A. Good tone.

Q. What does it have to do with Bullets over Broadway?

A. Bullets over Broadway is very, very interesting, because you know what, I was wrong. So when I said more often than not I'm right, here is an example where I'm wrong. It closed on Broadway and lost its 12 to $15 million investment. So I think the Nederlanders should be more than elated that I'm not part of their esteemed venerable organization of picking hits, because had I done it, whoa, Yippppe de da.[355]

Q. And is it right that the plan is for the season to include Broadway-style shows?

---

354    *Id.* at 282-85.

355    *Id.* at 310-11.

A. Those were her words. This was a proposal.

Q. Was that – I'm sorry?

A. This was a proposal.

Q. Was that your plan, to show Broadway-style shows?

A. I'm always open to ideas.

Q. Is Fun Home a Broadway-style show?

A. I'm always open to ideas, and I'm always open to great art, and I'm always open to great artists, and I always work in a way when the art is first – when it's not evident.  So I maintain that what I personally do or what one does in life is with the artist, and whether it's within 10 blocks in New York City, or downtown, or in Berlin, or London, as long as what I, Carole Shorenstein Hays, do, is immaterial to any of this.[356]

Q. After that conversation before it is opened, have you ever discussed with anyone the idea of bringing Hamilton to the Curran Theatre?

A. You know, I would love everything that I love to be at the Curran. So would I have loved Hamilton to be at the Curran, you betcha.

Q. Did you talk to anyone about it?

A. I talked to the butcher, the baker, the candlestick maker.

Q. But did you talk to the people who have any connection with Hamilton?

A. I talk. I talk. You know, I talk. Hamilton went where it went.  So I think that I am doing right by me and SHN is doing right by them. And this idea of scorched earth and I'm not allowed to talk to certain people is really kind of un-American.[357]

Q. What other plays that we haven't discussed have you tried to bring to the Curran?

A. I'm always in conversation and none – and I stand by what I say, that I wish everyone, everyone well and my

---

[356]     *Id.* at 327-28.

[357]     *Id.* at 357-58.

success is no reflection on SHN's successor failure. They truly maintain that I had nothing whatsoever to do with this business. So why are you so focused on who I am? I just find it really fascinating that on the one hand I know nothing, but on the other hand everything I know is stolen, perched, poached. So I think you better really think about the questions in a crisper way.[358]

Q. And tell me about the shows that, are there any shows that you're in discussions with now that have not yet been announced?
A. For?
Q. The Curran. And again, we can limit this to Broadway.
A. That will be announced at –you know, it's all subjection, isn't it? Because these are shows, and this is what I do and have always done with my own personal money, I invest in artists, I nurture them. They come to Broadway, they work, they go over places. It's interesting how you just said Broadway. See, it's such a Nederlander thing, because I am like in Brooklyn, downtown, and you don't ask me about that. You wouldn't ask me about Hamilton if when I had the conversation with Oskar Eustis – so it's a very Nederlander mindset that suddenly what is on Broadway is their fiefdom – and I say, whoa, wait a second, bring it on then, you guys tell me because, you know what –
Q. Mrs. Hays, I'm just trying to get a list. I started with Broadway because you told me earlier my question was too broad. I know that Fun Home is playing. I know Eclipsed is playing. We've talked about a number of other shows. Are there other Broadway-style shows that you have had conversations with people about bringing them to the Curran?
A. I always have conversations –
Q. What shows?
A. – with people. There are numerous shows.
Q. Tell me.

---

[358] *Id.* at 360.

A. I don't want to. I don't think it's any of your business whatsoever. I am pleased to answer the question. I am not hiding information. But it's my own money. I'm like free and clear. Why do I have to keep answering when I've just simply tried to get from Bob Nederlander who is behind him, who the successors are, and suddenly you have the right, the glee, the kaboom to ask me to go is that your personal e-mail – yes, we're going to emotionally water board you, we're going to keep you is down as far as you can go, as though that's like what we do under the name of the law that's what you went to law school for and that you will go home and tell your wife you had a great day – that's what we're doing?

I'm just simply trying to do my life at the Curran, and to do community programs. Let's talk about that. Let's talk about things that I wanted to do at SHN that I couldn't, because they weren't interested in.

I will be having – the reason I'm doing Eclipsed is because it has, it is about the Liberian kidnapped girls. Do you know about that? I'm sure you've heard about that. This is a show that no one would bring to Broadway except someone like me who believed in it, and it's a show that my son has really picked up, and it's about art and activism, and we at the Curran, we at the Curran are going to open our doors to bring in school kids to see shows maybe for the first time, to see, to do that.

That's what I want to do, and that's what I want to talk about. And you want to just take me, me and my and just keep bashing it against the wall, and I'm happy to stay until the lights come up and the lights go down. Don't bother me at all. Because I've been doing this 30 years. And you know what, I'm like Judy Garland, I can keep, keep, keep, – I got another song in me, and I know when I walk throughout the community, they're thrilled of what I'm doing.

It's – they don't look at me as being combative. They're thrilled I have a love of the Curran. I've never – I've never and I've always said to Bob Nederlander and to

> Greg Holland and to everyone else, this is a wonderful, wonderful, wonderful, business.[359]

Based on these answers, among others, I find that Carole willfully partook in bad faith litigation tactics that unnecessarily increased the cost of this litigation. I therefore award Counterclaim Plaintiff its attorneys' fees and costs incurred in connection with taking Carole's deposition.

### E. Relief Requested Post-Trial

On June 28, 2018, Counterclaim Plaintiff learned that Counterclaim Defendants had "booked Harry Potter and the Cursed Child ("Harry Potter") into the Curran Theatre."[360] On June 29, Counterclaim Plaintiff reached out to Counterclaim Defendants requesting information on whether Counterclaim Defendants disclosed this litigation to the producers and agents of Harry Potter and the deal terms of the production of Harry Potter at the Curran.[361] Counterclaim Defendants did not respond to the June 29 letter.

On July 3, 2018, Counterclaim Plaintiff filed a letter requesting that the Court order Counterclaim Defendants "to confirm that they have disclosed to the Harry Potter producers and agents the following: (i) the pending litigation and the nature

---

[359]    *Id.* at 364-68.

[360]    Countercl. Pl.'s Letter 1 (July 3, 2018).

[361]    *Id.* at Ex. B.

103

of the remedies that are currently under consideration by the Court and (ii) that such remedies, if awarded, could preclude presenting Harry Potter at the Curran."[362] Counterclaim Plaintiff asserts that this relief is necessary to "ensure Harry Potter's producers and agents are not harmed by any future Court ruling, and to protect SHN's goodwill with those producers and agents, in the event the Court awards NSF [Associates] and SHN access to the Curran Theatre."[363] Counterclaim Defendants responded by letter on July 13, 2018, arguing that the requested relief is procedurally and substantively improper. Counterclaim Plaintiff submitted a reply by letter on July 19, 2018. In light of the rulings contained in this memorandum opinion, I DENY the requested relief as moot.

## III. CONCLUSION

For the foregoing reasons, I grant a declaratory judgment that the Hayses breached their fiduciary duties as managers of the Company and are bound by the LLC Agreement as "Affiliates" of CSH Theaters and part of "the Shorenstein Entity;" enjoin Carole and Jeff from using confidential information they received or receive in their capacities as fiduciaries of the Company; award nominal damages for breaches of fiduciary duties; and award attorneys' fees and costs for Carole's deposition. All other relief is DENIED. The parties shall submit a joint

---

[362]     *Id.* at 4.

[363]     *Id.*

implementing form of order and final judgment within ten days of this memorandum opinion.

**IT IS SO ORDERED**.